**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| WEST VAL PHARMACY<br>HALLIDAY'S & KOIVISTO'S PHARMACY<br>RUSSELL'S MR. DISCOUNT DRUGS<br>FALCONER PHARMACY<br>DEAL DRUG PHARMACY<br>CHET JOHNSON DRUG,<br>on behalf of themselves and all others similarly situated,<br>　　　　　*Plaintiffs*,<br>　　　v.<br>ACTAVIS HOLDCO U.S., INC.<br>ACTAVIS ELIZABETH LLC<br>ACTAVIS PHARMA, INC.<br>APOTEX CORP.<br>AUROBINDO PHARMA USA, INC.<br>BARR PHARMACEUTICALS, LLC<br>CITRON PHARMA LLC<br>DAVA PHARMACEUTICALS, LLC<br>DR. REDDY'S LABORATORIES, INC.<br>FOUGERA PHARMACEUTICALS INC.<br>GENERICS BIDCO I, LLC<br>GLENMARK PHARMACEUTICALS, INC.<br>HERITAGE PHARMACEUTICALS, INC.<br>LANNETT COMPANY, INC.<br>MAYNE PHARMA INC.<br>MUTUAL PHARMACEUTICAL CO., INC.<br>MYLAN INC.<br>MYLAN PHARMACEUTICALS, INC.<br>PAR PHARMACEUTICAL, INC.<br>PERRIGO NEW YORK, INC.<br>PLIVA, INC.<br>RAJIV MALIK<br>SANDOZ, INC.<br>SUN PHARMACEUTICAL IND., INC.<br>TARO PHARMACEUTICALS U.S.A., INC.<br>TEVA PHARMACEUTICALS USA, INC.<br>WEST-WARD PHARMACEUTICALS CORP.<br>ZYDUS PHARMACEUTICALS (USA), INC.,<br>　　　　　*Defendants*. | CIVIL ACTION NO.<br><br><br><br>JURY TRIAL DEMANDED<br><br><br><br>**INDIRECT RESELLER PLAINTIFFS'**<br><br>**CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................................4

III.    PARTIES ...............................................................................................................................5

        A.      Plaintiffs ....................................................................................................................5

        B.      Defendants .................................................................................................................6

                •       Actavis Defendants ........................................................................................6

                •       Apotex ............................................................................................................8

                •       Aurobindo ......................................................................................................8

                •       Citron ..............................................................................................................8

                •       Dr. Reddy's ....................................................................................................8

                •       Glenmark ........................................................................................................9

                •       Heritage ..........................................................................................................9

                •       Lannett .........................................................................................................10

                •       Mayne ...........................................................................................................10

                •       Mylan Defendants ........................................................................................11

                •       Par Defendants .............................................................................................12

                •       Perrigo ..........................................................................................................13

                •       Sandoz Defendants .......................................................................................13

                •       Sun Defendants ............................................................................................14

                •       Taro ..............................................................................................................15

                •       Teva Defendants ...........................................................................................15

                •       West-Ward ....................................................................................................16

                •       Zydus ............................................................................................................16

C.      Co-Conspirators ..................................................................................17

IV.     INTERSTATE TRADE AND COMMERCE ....................................................17

V       FACTUAL ALLEGATIONS ..........................................................................18

A.      Defendants' overarching conspiracy...................................................18

B.      Specific acts in furtherance of the overarching conspiracy ...................21

• Nystatin ...............................................................................21

a.      Nystatin Tablets ...............................................21

b.      Nystatin Cream ................................................23

c.      Nystatin Ointment ...........................................24

• Nimodipine .........................................................................26

• Doxycycline Hyclate...........................................................27

a.      Doxycycline Hyclate Delayed Release ("Doxy DR") ...................27

b.      Doxyciline Hyclate 'regular' release ("Doxy RR").....................32

• Doxycycline Monohydrate ("Doxy Mono")........................33

• Zoledronic Acid ..................................................................36

• Meprobamate ......................................................................38

• Acetazolamide.....................................................................40

a.      Acetazolamide Tablets......................................41

b.      Acetazolamide Capsules ...................................41

• Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ")................43

• Glipizide-Metformin ..........................................................47

• Glyburide ............................................................................49

• Glyburide-Metformin..........................................................53

• Leflunomide ........................................................................56

• Paromomycin ......................................................................58

|  | • | Theophylline ...................................................................................60 |
|  | • | Verapamil .......................................................................................62 |

VI.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ............64

   A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy. .....................................64

   B.   Fraudulent Concealment Tolled the Statutes of Limitations. ...............................65

       1.   Active Concealment of the Conspiracy. ...................................................66

       2.   Plaintiffs Exercised Reasonable Diligence. ...............................................67

XIII.   CONTINUING VIOLATIONS ........................................................................68

XIV.   DEFENDANTS' ANTITRUST VIOLATIONS....................................................68

XV.   CLASS ACTION ALLEGATIONS ..................................................................70

XVI.   CAUSES OF ACTION ..................................................................................74

VII.   REQUEST FOR RELIEF ...............................................................................123

VIII.   JURY DEMAND .........................................................................................124

# I.      INTRODUCTION

1.      Independent pharmacy Plaintiffs West Val Pharmacy, Halliday's & Koivisto's Pharmacy, Russell's Mr. Discount Drugs, Falconer Pharmacy, Deal Drug Pharmacy, and Chet Johnson Drug have filed a total of eighteen drug-by-drug complaints in MDL 2724 alleging that the Defendants in those actions, many of which are named here, caused economic harm to pharmacies when they conspired to allocate markets and fix prices for generic drugs and thereby violated Section 1 of the Sherman Act as well as the antitrust, consumer protection, and unjust enrichment laws of various states.

2.      The anticompetitive conduct alleged in those previously-filed actions[1] and the actions described herein were all acts in furtherance of an overarching conspiracy among Defendant generic drug manufacturers to maintain and raise prices and to allocate customers and markets in order to assign each Defendant manufacturer its "fair share" of business while keeping prices high. When faced with competition, Defendants' employees met in person and called, emailed, and texted one another in order to coordinate the tactical details of their overarching anticompetitive strategy. These tactics included exchanging confidential pricing and marketing plans, ceding accounts in order to allocate customers, agreeing to follow list price increases or effective price increases, and submitting false bids. This industry-wide agreement affected the

---

[1] The drug-by-drug actions previously filed by IRPs in MDL 2724 include: **Albuterol** (16-AL-27243-CMR, Dkt. 2); **Amitriptyline** (16-AM-27243-CMR, Dkt. 2); **Baclofen** (16-BC-27243-CMR, Doc. 9); **Benazepril** (16-BZ-27243-CMR, Dkt. 2); **Clobetasol** (16-CB-27243-CMR, Dkt. 13); **Clomipramine** (16-CM-27243-CMR, Dkt. 2); **Desonide** (16-DS-27243-CMR, Dkt. 12); **Digoxin** (16-DG-27243-CMR, Dkt. 34); **Divalproex** (16-DV-27243-CMR, Dkt. 6); **Doxycycline** (16-DX-27243-CMR, Dkt. 39); **Econazole** (16-EC-27243-CMR, Dkt. 2); **Fluocinonide** (16-FL-27243-CMR, Dkt. 10); **Glyburide** (16-GL-27243-CMR, Dkt. 30); **Levothyroxine** (16-LV-27243-CMR, Dkt. 8); **Lidocaine-Prilocaine** (16-LD-27243-CMR, Dkt. 12); **Pravastatin** (16-PV-27243-CMR, Dkt. 9); **Propranolol** (16-PP-27243-CMR, Dkt. 5); and **Ursodiol** (16-FL-27243-CMR, Dkt. 8).

prices of the drugs already identified in Plaintiffs' previously-filed MDL 2724 actions as well as the Drugs at Issue identified here.

3.      The Drugs at Issue for purposes of this complaint are:

- Acetazolamide[2]
- Doxycycline Monohydrate[3]
- Doxycycline Hyclate[4],
- Fosinopril- Hydrochlorothiazide[5]
- Glipizide-Metformin[6]
- Glyburide[7]
- Glyburide-Metformin[8]
- Leflunomide[9]
- Meprobamate[10]
- Nimodipine[11]
- Nystatin[12]
- Paromomycin[13]
- Theophylline[14]
- Verapamil[15]
- Zoledronic Acid[16]

4.      In the interests of MDL case management, because Plaintiffs' previously-filed claims regarding Doxycycline Hyclate are currently pending a motion to dismiss, the Doxycycline Hyclate allegations are "at issue" herein only as part of the overarching conspiracy; they do not supersede the drug-specific claims in the previously-filed complaint. In contrast, because

---

[2] Acetazolamide includes tablets (125mg and 250mg) and extended release capsules (500mg).

[3] Doxycycline Monohydrate ("Doxy Mono") includes tablets (50mg, 75mg, 100mg and 150mg).

[4] Doxycycline Hyclate includes tablets (100mg) and capsules (50mg and 100mg); and delayed release ("Doxy DR") tablets (75mg, 100mg and 150mg).

[5] Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ") includes tablets (10-12.5mg and 20-12.5mg).

[6] Glipizide-Metformin includes Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg).

[7] Glyburide includes tablets (1.25mg, 2.5mg and 5mg).

[8] Glyburide-Metformin includes tablets (1.25-250mg, 2.5-500mg, and 5-500mg).

[9] Leflunomide includes tablets (10mg and 20mg).

[10] Meprobamate includes tablets (200mg and 400mg).

[11] Nimodipine includes liquid-filled capsules (30mg/l).

[12] Nystatin includes Nystatin cream; Nystatin ointment; and Nystatin oral tablets.

[13] Paromomycin include Paromomycin Sulphate capsules (250mg)

[14] Theophylline includes extended release tablets (100mg, 200mg, 300mg, 450mg, and 600mg).

[15] Verapamil includes Verapamil Hydrochloride regular tablets (40mg, 80mg and 120mg), extended release capsules (120mg, 180mg, 240mg and 360mg), and delayed release capsules (120mg, 180mg, and 240mg).

[16] Zoledronic Acid includes injections (4mg/5ml and 5mg/100mL).

Plaintiffs' previously-filed Glyburide complaint has not yet been briefed on motions to dismiss, the claims in that action are superseded by the claims alleged here. Finally, because the drugs Zoledronic Acid and Paromomycin are implicated in Defendants' overarching conspiracy and because Plaintiffs have evidence of specific sub-arrangements for these drugs, this complaint includes claims on behalf of any class members who purchased Zoledronic Acid and Paromomycin during the Class Period (defined below).

5.       Plaintiffs' allegations are based on information obtained from individuals with knowledge of the acts alleged herein and on information made public during ongoing government investigations of Defendants, but the bulk of the specific facts alleged herein were not known to Plaintiffs until, at the earliest, October 31, 2017, when the Plaintiff States revealed a proposed amended complaint in support of their motion for leave to amend.

6.       As a result of Defendants' scheme, independent pharmacies such as Plaintiffs paid, and continue to pay, supracompetitive prices for the Drugs at Issue.

7.       There are approximately 22,000 privately-owned independent pharmacies in the United States, many of which are mom-and-pop businesses that are crucial to their local communities.  Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

8.       Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or AmerisourceBergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies have no meaningful ability to negotiate these acquisition costs because they lack the wholesaler connections enjoyed by pharmaceutical consortiums (e.g., CVS, Walgreens) and

commercial clout of mass merchandisers (e.g., Wal-Mart, Target). The independent pharmacies must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

## II.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

10.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period Defendants transacted business throughout the United States, including in this District; Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

11.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Drugs at Issue throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for Drugs at Issue that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.    PARTIES

**A.    Plaintiffs**

12.    Plaintiff **West Val Pharmacy** ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate ("Doxy Mono"), Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ"), Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Theophylline, and Verapamil products at supracompetitive prices in California during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

13.    Plaintiff **Halliday's & Koivisto's Pharmacy** ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxy Mono, Glyburide, Meprobamate, and Verapamil products at supracompetitive prices during the Class Period, in Florida, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

14.    Plaintiff **Russell's Mr. Discount Drugs, Inc.** ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxy Mono, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Verapamil products at supracompetitive prices during the Class Period, in Mississippi, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

15.     Plaintiff **Falconer Pharmacy, Inc.** ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxy Mono, Fosi-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and Verapamil products at supracompetitive prices during the Class Period, in New York, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

16.     Plaintiff **Deal Drug Pharmacy** ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxy Mono, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Verapamil products at supracompetitive prices during the Class Period, in Tennessee, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

17.     Plaintiff **Chet Johnson Drug, Inc.** ("Chet Johnson") is a privately held independent pharmacy in Avery, Wisconsin. Chet Johnson purchased Defendants' generic Acetazolamide, Doxycycline Hyclate, Doxy Mono, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and Verapamil products at supracompetitive prices during the Class Period, in Wisconsin, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

## B.     Defendants

- **Actavis Defendants**

18.     Defendant **Actavis Holdco U.S., Inc.** ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceutical USA, Inc. acquired the generics business of Allergan plc, including Actavis, Inc.

Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceutical USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Allergan plc has received a subpoena from DOJ seeking information relating to the marketing and pricing of generic drugs and communications with competitors.

19.     Defendant **Actavis Pharma, Inc.** ("Actavis Pharma") is Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

20.     Defendant **Actavis Elizabeth LLC** ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco.

21.     Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Apotex**

22.     Defendant **Apotex Corp.** ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Aurobindo**

23.     Defendant **Aurobindo Pharma USA, Inc.** ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States. Aurobindo has received a subpoena relating to DOJ's generic drug investigation.

- **Citron**

24.     Defendant **Citron Pharma, LLC** ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States. Aceto Corporation (which purchased Citron's generic drugs assets) has disclosed that DOJ executed a search warrant at Aceto's offices in Port Washington, New York.

- **Dr. Reddy's**

25.     Defendant **Dr. Reddy's Laboratories, Inc.** ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad, in the state of Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in

Pennsylvania. During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

26.     Dr. Reddy's has received subpoenas from DOJ and the Connecticut AG seeking information relating to the marketing, pricing and sale of generic products and any communications with competitors about such products.

● **Glenmark**

27.     Defendant **Glenmark Pharmaceuticals, Inc.** ("Glenmark") is a Delaware corporation with its principal place of business is Mahwah, NJ. It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, in the state of Maharashtra, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

● **Heritage**

28.     Defendant **Heritage Pharmaceuticals, Inc.** ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Defendant Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, in the state of Maharashtra, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States. The former CEO and former President of Heritage, Jeffrey "Jeff" Glazer and Jason Malek, have both pleaded guilty to criminal price-fixing charges. The company has stated confirmed that it is fully cooperating with DOJ, and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for cartel violations.

- **Lannett**

29.     Defendant **Lannett Company, Inc.** ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the Pennsylvania Department of State as a foreign corporation. During the Class Period, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

30.     Lannett has received a subpoena from the Connecticut AG and a Senior Vice President of Sales and Marketing at Lannett was served with a grand jury subpoena relating to the federal investigation The subpoenas requested Lannett's corporate documents relating to communications with competitors regarding the sale of generic drugs, as well as the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

- **Mayne**

31.     Defendant **Mayne Pharma Inc.** is a Delaware corporation that has its principal place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories and has also operated under the name Midlothian since that time. In 2013, Mayne acquired Libertas Pharma. Unless addressed individually, Metrics, Inc. Midlothian Laboratories, Libertas Pharma and Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period, Mayne marketed and sold generic pharmaceuticals in this District and throughout the United States.

32.     Mayne has received a subpoena from the Antitrust Division of the US Department of Justice seeking information relating to marketing, pricing and sales of its generic drugs.

• **Mylan Defendants**

33.     Defendant **Mylan Inc.** is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

34.     Defendant **Mylan Pharmaceuticals, Inc.** is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

35.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

36.     Defendant **Rajiv Malik** ("Malik") is an individual residing at 605 Grandview Drive, Gibsonia, Pennsylvania. During the Class Period, Malik has acted as the President and Executive Director of Mylan N.V., which is the parent company of Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc. In his role as President of Mylan N.V., Malik is responsible for overseeing the sales and marketing of Mylan's generic pharmaceutical business, which is accomplished at least in part through acting on behalf of Defendant Mylan.

37.     DOJ subpoenas have been served on certain Mylan employees and senior management, as well as on the company itself, seeking information about communications with competitors regarding certain drugs, and, in September 2016, the FBI raided Mylan's offices pursuant to a search warrant issued in connection with the DOJ's price-fixing investigation.

- **Par Defendants**

38.     Defendant **Par Pharmaceutical Inc.** ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

39.     Defendant **Generics Bidco I, LLC** ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

40.     Defendant **DAVA Pharmaceuticals, LLC** ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.

41.     Par, Generics Bidco, and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. In August 2014, Endo acquired DAVA. In September 2015, Endo acquired Par. At the time of that acquisition, Endo had a separate subsidiary, Qualitest, that it had acquired in 2010. As stated in Endo's 2016 Form 10-K filed with the Securities & Exchange Commission ("SEC"): "[t]he Company's [Endo's] U.S. Generic Pharmaceuticals segment, which was formed through a series of acquisitions including Par, Generics International (US Parent), Inc. (formerly doing business as Qualitest Pharmaceuticals ("Qualitest")), Boca Pharmacal LLC (Boca) and DAVA Pharmaceuticals, Inc. ("DAVA"), now collectively doing business as Par Pharmaceutical, is the fourth largest U.S. generics company based on market share."[17] Par is thus the successor in interest to both DAVA and Qualitest. Unless addressed individually, Endo, Par, Qualitest, and

---

[17] Endo 2016 Form 10-K, *available at* http://annualreportendo.com/pdf/Endo-2016-Form-10-K.pdf.

DAVA are collectively referred to henceforth as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

42.      Par has also received subpoenas from the Antitrust Division of the DOJ regarding generic drug products and communications with competitors.

- **Perrigo**

43.      Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals to customers in this District and other locations in the United States.

44.      In May 2017, Perrigo revealed that its corporate offices had been raided by federal authorities seeking evidence related to generic drug pricing.

- **Sandoz Defendants**

45.      Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

46.      Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

47.     Unless addressed individually, Fougera and Sandoz Inc. are collectively referred to henceforth as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

48.     Sandoz and Fougera. have received a subpoena from the Antitrust Division of the U.S. Department of Justice requesting documents related to the marketing and pricing of generic drugs and communications  with competitors.

- **Sun Defendants**

49.     Defendant **Sun Pharmaceutical Industries, Inc.** ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Defendant **Caraco Pharmaceutical Laboratories Ltd.** ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products. In late 2012, SPII acquired Defendant **URL Pharma, Inc.** ("URL") and its subsidiary, Defendant **Mutual Pharmaceutical Company, Inc.** ("Mutual"), both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

50.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania

Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

51.     Unless addressed individually, SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States. Along with most of the Defendants named here, Sun has received a grand jury subpoena as part of DOJ's investigation.

- **Taro**

52.     Defendant **Taro Pharmaceuticals U.S.A., Inc.** ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharma. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

53.     Taro and two of its senior officers have received DOJ subpoenas seeking documents relating to generic drug pricing and communications with competitors

- **Teva Defendants**

54.     Defendant **Teva Pharmaceuticals USA, Inc.** ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva is registered with the Pennsylvania Department of State as a foreign corporation.

55.     Defendant **Barr Pharmaceuticals, LLC** ("Barr") is a Delaware company with its principal place of business North Wales, Pennsylvania. Barr Pharmaceuticals, LLC is a wholly-owned subsidiaries of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.)

in 2008. Prior to its acquisition by Teva, Barr was a holding company that operated through its principal subsidiaries: Barr Laboratories, Inc., Duramed Pharmaceuticals, Inc., and PLIVA, d.d. PLIVA, d.d. is a Croatian corporation with its headquarters in Zagreb, Croatia.

56.     Defendant **PLIVA, Inc.** ("PLIVA") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  PLIVA is a wholly-owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.

57.     Unless addressed individually, Teva, Barr and PLIVA are collectively referred to henceforth as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

58.     Teva has received subpoenas from DOJ and the Connecticut AG seeking documents relating to marketing and pricing of certain of generic products and communications with competitors.

- **West-Ward**

59.     Defendant **West-Ward Pharmaceuticals Corp.** ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. During the Class Period, West-Ward sold generic pharmaceuticals in this District and other locations in the United States. In January 2017, Hikma disclosed that West-Ward had received a subpoena from a state Attorney General, requesting certain information about generic drug pricing.

- **Zydus**

60.     Defendant **Zydus Pharmaceuticals (USA), Inc.** ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ. It is a subsidiary of Cadila HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the

Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

61.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

**C.     Co-Conspirators**

62.     Various other individuals and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have performed acts and made statements in furtherance of the conspiracy. The true names and capacities of additional co-conspirators are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

63.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.     INTERSTATE TRADE AND COMMERCE

64.     Defendants are the leading manufacturers and suppliers of the Drugs at Issue sold in the United States. The Drugs at Issue are produced by or on behalf of Defendants or their affiliates in the United States or overseas. During the Class Period, Defendants, directly or through their affiliates, sold the Drugs at Issue throughout the United States, including in this District.

65.     Defendants' conspiracy to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Drugs at Issue and Defendants' acts in furtherance of that conspiracy had, intentionally, a direct, substantial, and reasonably foreseeable anticompetitive effect on interstate commerce: Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of generic drugs within the United States.

## V.     FACTUAL ALLEGATIONS

### A.     Defendants' overarching conspiracy

66.     Defendants have each participated in a mutually-established code of conduct in the generic drugs industry that was developed to allow Defendants to raise and maintain prices far above what the drugs should cost. A foundational concept of the overarching conspiracy is the idea of "fair share."

67.     Generic drugs are commodity products.  In a competitive commodity market, a new manufacturer must offer prices lower than the competition in order to win customers. Defendants realize this, and, over time, have devised a system by which each Defendant is allocated its "fair share" of the market for a certain drug or formulation, based on the number of pre-existing competitors and their seniority. By making room for new entrants, the Defendants ensure that the newcomers will not attempt to win market share by offering lower prices, which Defendants call "trashing the market." The newcomers are therefore able to enter the market at artificially elevated prices, and thereafter, all of the conspirators are able to raise their prices, customer by customer, with knowledge that their share is mostly safe from competition.

68.     Arranging fair share is a longstanding industry practice. When Jeff Glazer began working at Defendant Heritage in 2006, the concept was explained to him by Konstantine Ostaficiuk, then a Heritage employee and currently the President of Camber Pharmaceuticals Inc.

While Defendants historically used their overarching agreement to allocate customers to prevent prices from decreasing, around 2011 they began to use their system aggressively, to impose enormous price increases on pharmacies and patients throughout the United States.

69.     The overarching conspiracy works because, to manufacture a generic drug and sell it in the United States, a manufacturer must have a Food and Drug Administration approval known as an ANDA (Abbreviated New Drug Application). Completing an ANDA takes time, but because Defendants can buy, trade, or license already-approved ANDAs, and because many of the Defendants do not make all the drugs they sell but instead subcontract to third party factories, they are always industry competitors of one another even if they are not product competitors at a certain moment. When current manufacturers learn that a new entrant has an ANDA, but has not yet announced prices or begun production, conspirators use the time before the newcomer's debut to coordinate fair share details.

70.     Plaintiffs have direct evidence of dozens of acts in furtherance of the fair share conspiracy. Implementation of the overarching conspiracy was accomplished by a series of overlapping bilateral calls, emails, texts, and online messages and by group meetings at industry conferences, private dinners, cocktails, and similar social outings. In the generic drug industry, conversations among competitors discussing customer allocation, cover bids, specific nonpublic prices, production details, and future price increases are so pervasive that some conspirators did not even question whether their arrangements were legal, despite being warned that such conversations were to be kept secret and never put into writing.

71.     Defendants' "fair share" scheme was not limited to a specific drug. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair shares could be allocated across the industry as a whole. In other instances,

competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. When customers sought new bids in response to price increases, Defendants in each sub-agreement discussed how to respond in order to honor their arrangements and maintain the profitable peace with one another. They often refused to bid or provided cover bids. Defendants who undercut other Defendants' prices were chastised for "not playing fair" because lowering prices is considered irresponsible and to the detriment of all.

72.     Implementation of the fair share scheme was often assigned to salespeople at the rank of "National Account Manager" ("NAM") or equivalent. Most of these NAMs had several years of experience in the generic drug industry and personal connections that facilitated the overarching conspiracy. NAM Susan Knoblauch worked at Caraco (Defendant Sun) for nearly ten years before moving to a different sales position at Defendant Citron. NAM Beth Hamilton worked at Defendant Apotex before moving to Defendant Mayne. NAM Daniel Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus, and currently works at Defendant Heritage. These individuals all reached back to their prior employers in order to allocate markets and agree to higher prices. For example, in the spring and summer of 2014, Heritage's Lukasiewicz—at the direction of CEO Glazer—spoke with Aurobindo to coordinate pricing on Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

73.     Another example: Teva's Director of Strategic Customer Marketing Nisha Patel met Heritage's then-Senior Vice President Jason Malek while she worked at AmerisourceBergen, which was a Heritage customer managed by Malek. When Patel moved to Defendant Teva in April 2013, she immediately contacted Malek to determine which drugs Heritage and Teva had in common, so that they could coordinate pricing.

**B.      Specific acts in furtherance of the overarching conspiracy**

74.      Plaintiffs have direct evidence of several episodes in the overarching conspiracy. This evidence below is recounted drug by drug, but on the calls and in the emails and conversations described herein, Defendants often made collusive arrangements on more than one drug at once.

- **Nystatin**

       a.      **Nystatin Tablets**

75.      By May 20, 2012, Heritage was in possession of confidential competitive information about Sun's plans for Nystatin. Heritage entered the Nystatin tablet market in summer 2012 and kept prices the same as Teva and Sun, pursuant to the "fair share" understanding.  By April 2013, Sun had acquired more market share, so employees of Sun, Teva, and Heritage formed a plan for Sun to raise its prices so that Heritage could obtain its "fair share." Heritage and Teva would then join Sun's increased prices.

76.      On April 16, 2013, the day after Sun doubled its price for Nystatin tablets, Susan Knoblauch (a Sun Senior Sales Manager) had a forty-minute call with Anne Sather (a Heritage NAM).

77.      Nisha Patel (Teva) and Jason Malek (Heritage) also spoke in April 2013 and later held a call on July 9, 2013 and continued to speak in late July 2013 as Teva listed Nystatin tablets for potential price increases. Patel told Malek that Teva, if not the first to take a price increase, would pretty quickly follow any price increase.

78.      Throughout February and March 2014, Malek (Heritage) and Patel (Teva) had a series of phone calls discussing price increases for multiple drugs, including at least Nystatin and Theophylline. On February 5, 2014, Malek (Heritage) returned a call from Patel (Teva). The two spoke for more than an hour and discussed a price increase for at least the drugs Nystatin and Theophylline.

79.     Following these discussions, Teva implemented a price increase for Nystatin tablets with an effective date of April 4, 2014. The increase more than doubled Teva's list price to a price nearly identical to Sun's.

80.     On April 15, 2014, Malek (Heritage) had a seventeen-minute phone conversation with Patel (Teva) in which they discussed at least seven different drugs: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. During their conversation, Malek and Patel agreed that Teva would lead the price increases for Nystatin and Theophylline, and that if Heritage increased prices for the other five drugs—Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not challenge Heritage's price increases.

81.     In addition to Heritage and Teva, those seven drugs were marketed and sold during the Class Period by Defendants Actavis, Apotex, Aurobindo, Citron, Mylan, Sun and Zydus.

82.     Anne Sather (Heritage) was responsible for communicating with Sun about the agreed-upon price increase for Nystatin tablets. On April 22, 2014, she and Susan Knoblauch (Sun) spoke for more than forty-five minutes and agreed to increase the prices of numerous drugs, including Nystatin tablets. After her call, Anne Sather emailed her Heritage co-conspirators Jeff Glazer, Jason Malek, Matthew Edelson, Rich Smith, and Neal O'Mara to report that Sun was "on board."  Glazer rapidly emailed her to tell her not to write such emails. Glazer then contacted Sather using his cell phone. On or about May 8, 2014 Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed the agreement she had reached with Sun.

83.     On June 25, 2014, during an internal Heritage teleconference about pricing, Sather exchanged text messages with Knoblauch (Sun), informing her of the details of Heritage's anticipated price increases.

84.     The agreements held. For example, on July 8, 2014, a large retail customer emailed Teva for a quote on Nystatin tablets, because its current supplier (Sun or Heritage) had announced a large price increase. Teva either did not provide a bid or provided a high cover bid that allowed Teva, Sun, and Heritage to maintain their anticompetitive agreement.

        b.     **Nystatin Cream**

85.     In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin external cream. Taro and Perrigo increased their prices in the late spring of 2011. Par followed the price increase in August, and Actavis joined in November. Sandoz joined the price increase when it re-entered the market in 2013.

86.     By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo the remainder.

87.     In June 2011, Taro initiated a large price increase of more than 600%. Rather than offer customers a much lower price than Taro, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable, even with the addition of a second market participant.

88.     In August 2011, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase, Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, pursuant to the fair share agreement.

89.     In November 2011, Actavis rejoined the market and elevated its prices to match that of Taro, Perrigo and Par. Typically, a generic drug market with more than three manufacturers

should see large declines in prices, but the prices remained stable because Taro, Perrigo, Par and Actavis won market share by allocating customers.

90.     In the autumn of 2013, Sandoz, like Perrigo, Par and Actavis before it, entered the market and priced its Nystatin cream at the same inflated level as its co-conspirators. As shown below, once in place, the prices remained stable through at least the summer of 2017.



91.     The agreement between Actavis, Par, Perrigo, Sandoz and Taro regarding Nystatin external cream was part of all Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Nystatin cream that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and forced them to pay more for Nystatin cream than they would have paid in a free and fair market.

    c.     **Nystatin Ointment**

92.     Nystatin external ointment prices followed a similar pattern to those of Nystatin external ointment. In 2009, Sandoz had captured approximately 75% of the market, while Perrigo

had 20% and Actavis 5%. From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market. By the summer of 2010 Actavis had approximately a 0% market share, though de minimis sales appear to have continued. By the summer of 2011, Sandoz had approximately a 5% market share.

93.     In June 2011, After Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

94.     Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As intended by the overarching "fair share" agreement among Defendants, prices for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the market place.

95.     In the summer of 2012, the pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June. Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant prices remained unchanged, just as devised by Defendants' agreement.

96.     As depicted in the graph below, Defendants' list price increases for Nystatin ointment were almost identical and the prices remained stable through at least the summer of 2017.



97.     The agreement between Actavis, Perrigo and Sandoz regarding Nystatin external ointment was part of all Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Nystatin ointment that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and forced them to pay more than they would have paid in a free and fair market.

- **Nimodipine**

98.     As part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Nimodipine:

99.     In June 2012, Teva planned to cease Nimodipine sales, which would leave Heritage and Sun as the only manufacturers of the drug. Heritage saw Teva's exit as an excuse to raise Nimodipine prices. At Jason Malek's direction, Anne Sather contacted her friend at Sun, Susan Knoblauch, to get her to support a price increase. Sather and Knoblauch texted and called each other throughout June 2012. A June 28, 2012 internal Heritage email from Sather to Malek

discusses the status of the fair share agreement on Nimodipine between Heritage and Sun. Around this time, Susan Knoblauch (Sun) reported the agreement to her boss, CEO G.P. Singh Sachdeva.

100.   Also on June 28, 2012, Sather noted that Heritage would submit a bid at a deliberately high price so that Sun could retain its customer, the wholesaler Cardinal. Heritage informed Sun about the pricing before submitting the bid to Cardinal. This information allowed Sun to retain Cardinal's business at a price that was higher than it would have been in a competitive market.

101.   In July 2012, Heritage and Sun again agreed that Heritage would provide a cover bid to a wholesaler, so that Sun could win business without lowering prices. Internal Heritage emails sent on July 20, 2012 discuss Heritage's anticompetitive agreements with Sun. Around the same time, Sather and Knoblauch met at a trade association meeting.in order to discuss their arrangements in person.

102.   Sather (Heritage) continued to obtain competitive information from Sun, as evidenced in emails sent on December 17, 2012 and April 16, 2013.

103.   The agreement between Heritage and Sun regarding Nimodipine oral tablets was part of Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Nimodipine that resulted from Defendants' anticompetitive conduct have injured Plaintiffs by forcing them to pay more than they would have paid in a free and fair market.

- **Doxycycline Hyclate**

  a.   **Doxycycline Hyclate Delayed Release ("Doxy DR")**

104.   On January 9, 2017, Defendant Heritage's former executives Jeff Glazer and Jason Malek entered guilty pleas admitting that, from about April 2013 until at least December 2015, they participated in a conspiracy with others engaged in the production and sale of generic

pharmaceutical products, including Doxycycline Hyclate and Glyburide, "the primary purpose of which was to allocate customers, rig bids and fix and maintain prices." Glazer and Malek further admitted that their co-conspirators—including individuals they "supervised at [Heritage]" and individuals they "reported to at [Emcure]"—were "engaged in discussions and attended meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate" and that during these meetings "agreements were reached to allocate customers, rig bids and fix and maintain the price of doxycycline hyclate."[18]

105.    The events culminating in the criminal convictions of Malek and Glazer illustrate the fair share agreement and understanding. This particular episode in the overarching conspiracy involved at least Mylan and Heritage.

106.    Between Heritage's ANDA approval in April 2013 and its first sales in July 2013, Mylan and Heritage arranged compromises to keep Doxy DR prices high upon Heritage's entry.

107.    In April 2013, Heritage executives Jeff Glazer and Jason Malek traveled to the Pune, India headquarters of their parent company, Emcure, to discuss plans to enter the Doxy DR market and to increase prices for a list of drugs. At these meetings, it was decided that Emcure CEO Satish Mehta would reach out to Defendant Rajiv Malik, Mylan's President and Executive Director, in order to facilitate communication between Glazer and Malek and their Mylan counterparts and minimize competition.

108.    On or about May 7, 2013, Glazer (Heritage) emailed Defendant Rajiv Malik. He copied Emcure executives Satish Mehta and Vikas "Vik" Thapar on the email. Malik responded

---

[18] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, 16-cr-506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 22:4-11 (admitting facts); Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 16-cr-508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 21:23-22:6 (admitting facts).

with a phone number where he could be reached in England. A call took place the next day, May 8, 2013, during which Heritage and Mylan reached an understanding that would allow them to refrain from competing over Doxy DR.

109.     Glazer (Heritage) told Malik (Mylan) that Heritage intended to pursue two of Mylan's Doxy DR customers, McKesson and CVS, who summed up to about 30% of the market. Glazer also told Malik that Heritage wanted to obtain some business without having to underbid Mylan. After numerous discussions, Rajiv Malik and Glazer agreed that Mylan could give up Doxy DR sales to McKesson and CVS based upon Mylan's understanding that Heritage would enter the market without eroding the pricing of Doxy DR. In these conversations, Malik (Mylan) cited a prior generic drug allocation deal as a reason why Mylan was willing to play fair.

110.     Malik (Mylan) told Glazer (Heritage) that he would inform others at Mylan about their agreement on at least Doxy DR. Glazer himself informed Malek (Heritage) about conversations with Rajiv Malik and others at Mylan.

111.     On June 11, 2013, either James Nesta or Michael Aigner (both at Mylan) called Neal O'Mara (Heritage, Associate Director of National Accounts), and immediately afterwards, O'Mara called Malek (Heritage) and left a voicemail providing a report.

112.     On June 18, 2013, the wholesaler McKesson told Mylan that a new manufacturer of Doxy DR had offered a bid, and that Mylan could submit a counterbid by June 21, 2013. Consistent with the fair share agreement, Mylan knew that the new manufacturer was Heritage, declined to submit a counterbid, and ceded the contract to Heritage, which won the contract on June 27, 2013.

113.     Heritage next submitted bids to CVS on July 8, 2013 and July 13, 2013. During this time, Heritage and its parent Emcure continued to communicate with Mylan to make sure Mylan

was committed to their Doxy DR fair share arrangement. Emcure's Mehta spoke to Mylan's Malik on July 18, 2013. Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

114.     To follow up with Mylan, Glazer emailed Rajiv Malik to schedule a phone call on July 18, 2013. Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voicemail. Fifteen minutes later, Glazer returned Malik's call and they spoke for four minutes. During the call, Glazer reminded Malik of Heritage's strategy with respect to at least Doxy DR and its bid to CVS.

115.     In response to their conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan walked away from the business in order to play fair with Heritage.

116.     In August 2013, Mylan was again offered a chance to counterbid for Doxy DR. Pursuant to the fair share agreement, Mylan offered a price it knew was too high, and, when offered a second chance, did not revise it. In September 2013, the customer (presumably CVS) awarded its Doxy DR business to Heritage.

117.     Sales to McKesson and CVS account for more than 80% of Heritage's Doxy DR business. Heritage continues to maintain that business to this day.

118.     By making a deal according to the fair share system, Mylan and Heritage were able to stabilize Doxy DR prices—not just for these accounts, but across the market—and kept Doxy DR prices higher than they otherwise would have been.

119.     Moreover, after entering the Doxy DR market and throughout the Class Period, Defendants including Actavis, Mayne, Mylan, Par, Sun, and Heritage were in frequent contact with each other about numerous drugs, including Doxy DR.

120.    For example, on January 7, 2014, about a month before Defendant Mayne's entry into the Doxy DR market, Heritage's Anne Sather had a twelve-minute call with Gloria Peluso-Schmid (Mayne's Director of National Accounts), to work out a deal to avoid price erosion for Doxy DR. Mayne and Heritage employees continued to communicate via text messages and emails, and via calls on March 13, March 17, April 1, April 2, and April 9, 2014. The content of the calls is corroborated by internal Heritage texts and emails detailing Mayne's strategy. For example, on April 2, Malek emailed CEO Glazer to provide an update on fair share negotiations with Mayne, and on April 9, Sather sent an update to Malek.

121.    When Mayne entered the market, it initially avoided competition with Heritage and instead targeted Mylan's customers, because Mylan had more than its "fair share." Mayne made a bid to one of Mylan's large wholesaler customers, which caused the wholesaler to ask Heritage for a bid. Heritage declined and provided a false, pretextual reason (inadequate supply) to the wholesaler. Malek knew Heritage had sufficient supply of Doxy DR to fulfill the bid, but had Heritage decline to bid in order to honor Heritage's agreement with Mylan.

122.    Similarly, in August 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

123.    In November of 2014, Mayne made offers to two Doxy DR customers: McKesson and Econdisc. Heritage contracted Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow-up communications occurred in December 2014 by text message and by face-to-face meetings at a conference held on December 9, 2014.

124.     The agreement resulted in prices for Doxy DR that were higher than they would have been absent Defendants' fair share arrangements. In January 2015, when Econdisc requested Doxy DR bids, Heritage deliberately bid a higher price than Mayne (a cover bid), fulfilling its agreement to walk away from the Econdisc business. In September 2015, when a large nationwide pharmacy chain asked Heritage to submit a bid, pursuant to the overarching agreement and the specific arrangements with Mayne, Heritage declined to bid after learning that Mayne was the incumbent supplier.

125.     The agreement between Heritage, Mayne and Mylan regarding Doxy DR was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

### b.     Doxycyline Hyclate 'regular' release ("Doxy RR")

126.     Defendants Sun, Actavis, and West-Ward, and later, Mylan and Par, were the main manufacturers of Doxy RR during the Class Period.

127.     As outlined in Plaintiffs' previously-filed Doxycycline complaint, prices of Doxy RR shot upwards beginning in the fall of 2012. In November 2012, Sun increased its prices by up to 155% higher than the month before. Other Doxy RR manufacturers followed suit, with further price hikes in January 2013 (West-Ward) and February 2013 (Actavis, Sun, and West-Ward). In the two weeks between January 21, 2013 and February 5, 2013, Sun, West-Ward, and Actavis all raised the average effective prices of their 50 mg capsules by approximately 2000%, to identical levels. In the same two weeks, these Defendants raised the average effective prices of their 100 mg capsules and 100 mg tablets by between 2,515% and 7,844%. A drug that had previously cost a nickel per pill now cost thirty or forty times as much.

128.   In 2013, Defendants Actavis, Sun, and West-Ward's combined revenue from sales of Doxy RR was about $966 million.  In 2011, the year before they implemented their fair share agreement, their total revenue had been about $23 million.

129.   This collusive pricing continued after Par (through DAVA) entered the market. Despite having access to a reliable supplier that could meet demand, DAVA refused to take shipments of Doxy RR, and restricted supply in order to keep prices high, pursuant to the overarching fair share agreement. In a July 11, 2014 email, DAVA stated to its Doxy RR supplier that DAVA's plan was to sell Doxy RR "slowly not to disturb pricing."

130.   Prices for Doxy RR have remained high. In April of 2016, Sun's effective prices were as much as 1,165% higher than in October of 2012 and the price of 100 mg capsules remained 560% higher than in October 2012. In April of 2016, West-Ward's average effective prices were as much as 1,558% higher than in October 2012 and Actavis's average effective prices were as much as 2,164% higher than in October of 2012.

131.   The agreement between Sun, Actavis, West-Ward, Mylan, and Par regarding Doxy RR was part of all Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Doxy RR that resulted from Defendants' anticompetitive conduct have injured Plaintiffs by forcing them to pay more than they would have paid in a free and fair market.

- **Doxycycline Monohydrate ("Doxy Mono")**

132.   Doxy Mono is the molecular cousin of Doxycycline Hyclate and is an antibiotic used to treat bacterial infections including malaria.

133.   Around 2012 and 2013, Heritage, Lannett, Mylan, and Par were the largest manufacturers of Doxy Mono tablets.

134.    Throughout March 2013, Heritage communicated with Lannett about pricing for at least Doxy Mono, continuing conversations that had begun in late 2012 (or possibly earlier). Anne Sather (Heritage) and Tracy Sullivan (Lannett), who were former coworkers at Paddock Labs, discussed the need to increase list prices on calls on March 7, 2013 (regarding prices to Cardinal), and in emails and phone calls on March 13, 2013. Manufacturers can modify prices for a certain product they sell by adjusting a list price, or they can leave the list price static while offering discounts off of the list price, often expressed in percentages. Although list prices for Doxy Mono appear to have remained level, the effective prices increased between the spring and fall of 2013.

135.    On March 21, 2013 internal Heritage emails indicate intentions to seek a quadrupling of the price of Doxy Mono, and Lannett internal emails sent four days later, on March 25, 2013, indicate that Tracy Sullivan was speaking with Heritage about price increases for specific drugs, including Doxy Mono.

136.    On May 14, 2013, Sullivan (Lannett) and Sather (Heritage) attended a conference together where they spoke in person and exchanged text messages discussing a tactic for at least Doxy Mono.

137.    On June 11, 2013—the day before Lannett's price increase, Neal O'Mara (Heritage) spoke with Michael Aigner (Mylan) for nearly ten minutes. Around this time, a Lannett employee was in communication with an unidentified employee at Par (likely the Vice President of National Accounts). In turn, this Par employee frequently communicated with an unidentified Mylan employee. The Lannett and Par employees were friends and frequently spoke in person at trade association conferences, including about competitive information.

138.    Employees from Mylan and Par had several calls on June 7, 2013 and June 13, 2013—the day after Lannett confirmed that it would increase its prices for Doxy Mono. Further,

an unidentified employee at Lannett exchanged nine text messages with an unidentified competitor on June 11 and June 12, 2013.

139.    Anne Sather (Heritage) also met with a Par employee in Arizona on August 1, 2013.

140.    Days later, Malek asked Anne Sather to obtain specific information about Lannett's price increase for Doxy Mono, so Sather met with Tracy Sullivan (Lannett) on Aug 11, 2013, during a conference in Las Vegas. After the meeting, and in response to a directive from Malek, Sather sent a text message to Sullivan. The next day, while still at the conference, Sather and Sullivan texted again. Sather also exchanged several text messages and phone calls with another employee at Lannett. In addition, a Lannett employee also sent a text message to Par.

141.    During the evening of August 13, 2013 an employee at Par sent an email, which circulated internally. The email included information about pricing agreements related at least to the prices of Doxy Mono.

142.    On August 20, 2013, a week after Par's internal discussion, Heritage's Sather emailed Malek and confirmed Lannett's agreement related to the pricing of at least Doxy Mono.

143.    Immediately after a Heritage price increase teleconference on April 22, 2014, Sather communicated with three different competitors, including a half-hour call with Lannett's Sullivan about pricing for Doxy Mono. Through these conversations, Sather reached a number of pricing agreements covering Doxy Mono and at least four other drugs.

144.    Similarly, on April 23, 2014, Neal O'Mara (Heritage) contacted Michael Aigner (Mylan) and obtained an agreement to raise prices on at least three different drugs, including Doxy Mono. Aigner said that he would inform the Mylan salespeople not to compete with Heritage's price increases, and would also tell the higherups at Mylan. Immediately after speaking with Aigner (Mylan), O'Mara sent an email to Malek apprising him of the discussions.

145.    On May 8, 2014, Malek requested an update on discussions with competitors. Sather responded to Malek's email, providing an update on her communications with three Defendants about five drugs, including Lannett about Doxy Mono.

146.    The agreement between Heritage, Lannett, Mylan and Par regarding Doxy Mono was part of all Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Doxy Mono that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

- **Zoledronic Acid**

147.    Zoledronic Acid is used to treat bone issues related to cancer and blood calcium levels and is sold as 4 mg and 5 mg injections.

148.    In early 2013, Heritage employees prepared to be the first to sell generic Zoledronic Acid but were aware that their friends at Dr. Reddy's would be close behind and would therefore demand their fair share. (Par debuted Zoledronic Acid about eight months after Heritage and Dr. Reddy's, by acquiring an ANDA from Breckenridge).

149.    On January 21, 2013, Heritage's Malek instructed Neal O'Mara to reach out to his contact at Dr. Reddy's (John Adams, who was VP of Sales and Marketing), to discuss Dr. Reddy's pricing strategy and launch date.

150.    The next day, January 22, 2013, John Adams (Dr. Reddy's) called Neal O'Mara (Heritage). They spoke for ten minutes, and then for another nine minutes an hour later. O'Mara later reported to Malek that Dr. Reddy's wanted its "fair share" of the market. Under the Defendants' overarching conspiracy, fair shares were allocated to Defendants within a particular drug market based upon the number of competitors and their seniority in the market. O'Mara outlined that if Dr. Reddy's was the first to sell Zoledronic Acid—consistent with fair share

agreements that had long existed in the generic pharmaceuticals industry—it expected around a 60% or 66% share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share split would be 50-50. O'Mara (Heritage) and Adams (Dr. Reddy's) had further calls on January 24 and on March 5, 2013.

151.    While these conversations were occurring, Heritage's Malek learned that Dr. Reddy's was offering Zoledronic Acid at prices lower than expected. Malek was upset by Dr. Reddy's pricing because Malek did not view Dr. Reddy's as "playing fair." He emailed Sather and O'Mara on March 6, 2013 to express this concern and to ask about pricing. On March 13, O'Mara provided his Heritage bosses with an update on the conversations with Dr. Reddy's Adams.

152.    On April 3, 2013, Heritage's O'Mara spoke with Dr. Reddy's Adams and confirmed that Dr. Reddy's had just begun shipping the 5 mg injection. Adams also provided information about its pricing. O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both Zoledronic Acid and Meprobamate.

153.    Consistent with their agreement, in April 2013 both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement and maintained nearly identical list prices through at least early 2016. These list prices remained stable even when a third manufacturer entered the market.

154.    Heritage's ability to contact Dr. Reddy's and obtain an agreement on allocation of the market and the price of Zoledronic Acid would not have been possible without the well-established norms of the fair share agreement among Defendants. The discussions between Dr. Reddy's and Heritage make clear that they did not start from zero in working out the details of their agreement on Zoledronic Acid, but built on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

155.    Some Defendants were aware that their conversations were illegal. For example, on March 1, 2013, Heritage's Malek received an email acknowledging the wrongfulness of the discussions with Dr. Reddy's. Additionally, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

156.    When Par finally entered the market in late 2013, it announced list prices above Heritage and Dr. Reddy's. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's, despite the fact that the injections could be produced at a cost sufficiently low enough to offer competition. Instead, consistent with the "fair share" agreement, Par announced higher prices to prevent price erosion in the market for Zoledronic Acid.

157.    List prices for Dr. Reddy's, Heritage and Par remained elevated and unchanged through at least the middle of 2015.

158.    The agreement between Dr. Reddy's, Heritage and Par regarding Zoledronic Acid was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Zoledronic Acid that resulted from Defendants' anticompetitive conduct have injured members of the IRP class and caused them to pay more than they would have paid in a free and fair market.

- **Meprobamate**

159.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Meprobamate:

160.    Meprobamate, also known by the brand-names Miltown® and Equanil®, is used to treat short-term anxiety, tension, and insomnia.

161.    While Dr. Reddy's and Heritage were negotiating pricing and market share for Zoledronic Acid (as discussed above), they also were discussing pricing for Meprobamate.

162.    On March 21, 2013, Heritage's Malek emailed Neal O'Mara and Matthew Edelson and instructed them to tell Dr. Reddy's—the only competitor remaining in the Meprobamate market after Actavis ceased sales—that Heritage wanted to quadruple the price of Meprobamate. Malek's proposed price increase was approximately four times the current price. At this time, O'Mara had already been discussing the pricing of Zoledronic Acid with Dr. Reddy's Adams for several months.

163.    On March 22, 2013 Heritage's O'Mara spoke to Dr. Reddy's Adams for nine minutes about at least Meprobamate. During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of Meprobamate.  O'Mara confirmed the agreement in an email to Malek that same day: "Dr. Reddy's is on board."

164.    Three days later, on March 25, Malek emailed O'Mara about the agreement and O'Mara responded again confirming that Dr. Reddy's would be "following suit" if Heritage raised the price on Meprobamate.

165.    On March 27, 213, AmerisourceBergen ("ABC") asked Heritage to submit a bid on both formulations of Meprobamate because of supply issues with Dr. Reddy's.

166.    Heritage discussed the issue over internal emails and meetings that indicate an understanding of the agreement between Heritage and Dr. Reddy's on pricing for Meprobamate and an intention to abide by it. This agreement was confirmed in a four-minute call between Heritage and Dr. Reddy's on March 29, 2013.

167.    In April 2013, Dr. Reddy's approached Heritage to discuss obtaining additional market share on Meprobamate and asked Heritage to give up a specific large pharmacy chain.

Pursuant to the overarching agreement and detailed discussions with Dr. Reddy's, Heritage gave up some of its market share to Dr. Reddy's. Malek clarified the agreement in a communication with Dr. Reddy's on May 17, 2013.

168.    Acting in furtherance of the overarching conspiracy, Dr. Reddy's and Heritage's coordination raised Meprobamate prices across the board. Their price increases became effective in late April and early May 2013. Heritage and Dr. Reddy's imposed identical list prices for 200mg Meprobamate tablets (an increase of nearly 400%) and 400mg Meprobamate tablets (an increase of approximately 350%). List prices and effective prices remained elevated at least through July 2017.

169.    On April 24, 2014, a Heritage employee exchanged six text messages with his contact at Dr. Reddy's about pricing for at least Meprobamate. The two spoke briefly on May 6, 2014.

170.    The agreement between Dr. Reddy's and Heritage regarding Meprobamate was part of all Defendants' overarching conspiracy to restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Meprobamate that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

   ● **Acetazolamide**

171.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Acetazolamide:

172.    Acetazolamide, also known by the brand name Diamox®, among others, is a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. Acetazolamide is sold in two formulations—tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus and Teva).

### a.       Acetazolamide Tablets

173.    Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share for their sales of the Acetazolamide tablets.

174.    In April and May of 2012, Taro and Lannett imposed 40% to 50% list price increases and brought their list prices for Acetazolamide 250mg tablets to identical levels. Taro also increased the list price of its 125mg tablets around this time.

175.    By the end of 2013, Taro and Lannett were ready to impose a large price increase. In November and December 2013, Taro and Lannett imposed identical list prices for Acetazolamide 250mg tablets. The increases were well over 200%. Taro imposed a similarly large list price increase on 125mg tablets around this time. Other measures of prices for both products also increased and persisted at elevated levels through at least July 2017.

176.    Throughout their coordinated price increases, Taro and Lannett kept stable shares of the 250mg tablet market, with Lannett claiming approximately 56% and Taro claiming 44%. Taro, as the lone manufacturer of 125mg tablets, had 100% of sales of that dosage, but the total dollar sales across both products was virtually even, because the overarching fair share agreement suggested that Lannett's larger share of 250mg tablets be offset by Taro's sales of 125mg tablets

177.    The agreement between Taro and Lannett regarding Acetazolamide tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Acetazolamide tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

### b.       Acetazolamide Capsules

178.    The majority of the Acetazolamide capsule market is captured by Heritage, Teva and Zydus, with Heritage and Teva accounting for approximately 78% of sales.

179.    On April 15, 2014, on a seventeen-minute call between Heritage's Malek and Teva's Nisha Patel, the two agreed that if Heritage increased the price of Acetazolamide and a series of other drugs, Teva would follow the price increases—or at least not challenge Heritage's price increases by underbidding Heritage's customers. For two other drugs—Nystatin and Theophylline —Teva had already confirmed that Heritage would support Teva's efforts to raise prices.

180.    The two spoke several more times over the summer of 2014 to confirm their agreement to raise prices and to discuss the progress of Heritage's price increases.

181.    On April 16, 2014, the day after Malek (Heritage) spoke to Patel (Teva), an employee at Teva —likely Patel—called an employee at Zydus to discuss the pricing of at least Acetazolamide. The two spoke for nearly twenty minutes and spoke again the next day for nearly twelve minutes. They continued to communicate over the next several months.

182.    During the April 22, 2014 Heritage price increase teleconference, Jason Malek said Acetazolamide was susceptible to a fair share negotiation and assigned himself the task to communicate with Defendants Teva and Zydus. Anne Sather was assigned to make arrangements with Lannett as well as two other Defendants. Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

183.    While Teva's Patel and Heritage's Malek discussed raising the prices for at least the seven drugs discussed above, on April 24, 2014, Malek contacted a Zydus employee through the website LinkedIn to discuss at least Acetazolamide. That employee responded later that day.

184.    In emails sent on May 6 and 7, 2014 Malek explained that he had obtained agreements to raise the price of Acetazolamide. Malek had previously told an unidentified Heritage sales person to hold off on responding to a large customer's request for a price reduction. After

confirming his agreement with competitors to raise the price of Acetazolamide, he informed the sales person that Heritage would not agree to reduce its price, presumably because of its agreement with competitors.

185.    Malek also confirmed an agreement with another competitor—most likely Zydus—on Acetazolamide pricing on May 7, 2014.

186.    During this time Heritage avoided bidding on any potential customers to whom Zydus was already supplying Acetazolamide. Heritage did so in furtherance of Defendants' agreement not to compete on the Drugs at Issue.

187.    During this time, employees at Teva and Zydus were also in contact regarding Acetazolamide. On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

188.    By July 9, 2014, Heritage had raised the price of Acetazolamide to at least seventeen different customers nationwide, and had also increased prices for at least eight other drugs.

189.    The agreement between Heritage, Teva and Zydus regarding Acetazolamide capsules was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Acetazolamide capsules that resulted from Defendants' anticompetitive conduct have injured Plaintiffs by forcing them to pay more than they would have paid in a free and fair market.

- **Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ")**

190.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Fosi-HCTZ:

- 43 -

191.    Fosi-HCTZ, also known by the brand name Monopril HCT®, is used to treat hypertension. It is a tablet that combines Fosinopril and the diuretic Hydrochlorothiazide..

192.    In early 2012, the incumbent manufacturers of Fosi-HCTZ were Aurobindo, Glenmark and Sandoz. In the spring of 2012, Heritage entered the market with a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark. Citron did not enter the market until 2014

193.    Even though it did not offer better pricing, Heritage quickly captured market share for Fosi-HCTZ, consistent with the fair share agreement between Defendants.

194.    As discussed above, during the April 22, 2014, teleconference at Heritage, Fosi-HCTZ was listed for a price increase and, because Daniel Lukasiewicz was a former Aurobindo employee, he assigned to "socialize the increase" with Aurobindo.

195.    On or about April 28, 2014, Malek emailed Lukasiewicz, directing him to contact an employee at Aurobindo (likely Paul McMahon, Senior Director, Commercial Operations) about pricing for at least Fosi-HCTZ, Glyburide, and Glyburide-Metformin. Face to face, Glazer told Lukasiewicz not to put his pricing communications with Aurobindo in writing. Lukasiewicz exchanged several voicemails with one of his contacts at Aurobindo on April 28 and 29, 2014. On May 2, 2014   Lukasiewicz contacted an employee at Glenmark via LinkedIn to discuss pricing for at least Fosi-HCTZ.

196.    On May 8, 1014, Lukasiewicz (Heritage) spoke by phone with an Aurobindo contact for sixteen minutes. During this call, they reached an agreement to raise the price of at least Fosi-HCTZ, Glyburide-Metformin, and Glyburide.

197.    On May 9, Heritage held another internal conference call to discuss the list of drugs proposed for increases. Fosi-HCTZ, Verapamil, Theophylline ER, Paromomycin, Nystatin,

Nimodipine, Leflunomide, Glyburide-Metformin, and Glyburide were all on the May 9 price increase list. During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

198.    On May 14, 2014, Anne Sather (Heritage) attended a conference in Bloomington, Minnesota, at which she confirmed agreements on pricing with at least Aurobindo (Fosi-HCTZ, Glyburide, and Glyburide-Metformin), Sandoz (Fosi-HCTZ), and Lannett (Doxy Mono). Sather emailed Malek on May 15, 2014 telling him of the agreements with Aurobindo, Sandoz, and Lannett.

199.    Also on May 15, 2014, having spoken with Sather (Heritage), the same Aurobindo and Sandoz employees spoke by phone and texted each other multiple times. During this time, an employee at Aurobindo also spoke with employees at Glenmark and Sandoz about price increases for Fosi-HCTZ.

200.    On May 15, 2014, a large pharmacy customer informed Heritage that Aurobindo had recently provided a lower bid for Fosi-HCTZ. Sather recommended that Heritage not reduce its price to retain business, because she was confident that Aurobindo would stick to the pricing strategy she and Aurobindo had arranged the day prior.

201.    On June 23, 2014 the Heritage sales team held a meeting where they discussed the specific percentages for price increases on certain drugs and their strategy for the increases. The proposed increase for Fosi-HCTZ was 200% over the current price.

202.    Heritage's Lukasiewicz spoke with his contact at Aurobindo for eighteen minutes on June 25, the day before Heritage issued price increase letters for numerous drugs, including Fosi-HCTZ.

203.    Also on June 25, 2014 a Heritage employee texted a friend at Citron to discuss Citron's entry into the Glyburide market and proposed price increases in that market. During this text exchange, Heritage learned for the first time that Citron was also planning to enter the market for Fosi-HCTZ. After learning that Citron was a potential Fosi-HCTZ competitor, the Heritage employee disclosed Heritage's plan to raise Fosi-HCTZ prices. The next day, June 26, 2014, Heritage issued price increases for nine drugs including Fosi-HCTZ, to numerous customers,.

204.    On July 1, 2014, Citron called an employee at Heritage to discuss Citron's agreement to raise prices on certain drugs and to discuss Heritage's price increase plan for Fosi-HCTZ. They spoke for thirteen minutes. During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for Fosi-HCTZ or any other drugs.

205.    On July 18, 2014, a Heritage employee—likely Lukasiewicz—spoke directly with a Glenmark employee for twenty-three minutes about at least Fosi-HCTZ.

206.    During this time, Citron was also in direct communication with Aurobindo. On July 28, 2014, an employee of Citron called and texted an employee at Aurobindo several times and they held a twenty-four minute call. Citron then confirmed internally that Heritage had increased its list prices for Fosi-HCTZ and two other drugs that Citron was trying to match on price increases.

207.    Citron spoke with an employee of Glenmark twice on July 14, 2014 for seven minutes and then another thirteen minutes. The next day, Citron increased its Fosi-HCTZ prices to be in line with the price increases adopted by Heritage.

208.    The agreement between Aurobindo, Citron, Glenmark, Heritage and Sandoz regarding Fosi-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs

at Issue. The elevated prices of Fosi-HCTZ that resulted from Defendants' anticompetitive conduct have injured Plaintiffs by forcing them to pay more than they would have paid in a free and fair market.

- **Glipizide-Metformin**

209.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Glipizide-Metformin:

210.    Glipizide-Metformin HCl, also known by the brand name Metaglip®, is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.

211.    Since 2009, numerous Defendants have sold Glipizide-Metformin, including Mylan, Teva, Sandoz (mostly exited the market by 2010), Actavis (mostly exited the market by 2014), Heritage (entered the market in 2010 and mostly exited the market by July 2017), Sun (sold de minimis amounts up until 2016) and Zydus (entered the market in September 2016).

212.    By April 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin market.

213.    As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed seven different drugs for which Teva was a competitor of Heritage, including Glipizide-Metformin. During their conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin, Teva would also increase its prices for these drugs, or at a minimum, it would not challenge Heritage's price increases.

214.    Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their arrangements regarding numerous drugs, including Glipizide-Metformin.

215.     As discussed above, during an April 22, 2014 Heritage sales team teleconference, eighteen different drugs were slated for a price increase, including Glipizide-Metformin.

216.     Concurrent with these discussions, and as outlined throughout, Heritage sales staff spoke with all Defendants to formalize pricing agreements. For Heritage, Neal O'Mara was responsible for communicating with Mylan (either Mike Aigner or Jim Nesta) about a number of drugs, including Glipizide-Metformin. On April 23, the day after Malek directed Heritage's sales team to contact Defendants about eighteen drugs slated for a price increase, Mylan and Heritage agreed to raise prices on at least three different drugs, including Glipizide-Metformin. O'Mara conveyed this agreement with Mylan to Malek via email the same day.

217.     Teva and Mylan were also in frequent communication regarding pricing. On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least Glipizide-Metformin. Their conversations included one call that lasted more than seven minutes. They continued to be in contact throughout 2014.

218.     Also on May 9, 2014, Heritage held an internal call about price increases. Glipizide-Metformin was one of the drugs slated for a price increase and was also identified on a June 25 spreadsheet circulated by Keith Fleming.

219.     On June 26, 2014, Heritage began contacting its customers to notify them of price increases for nine drugs, including Glipizide-Metformin. Glipizide-Metformin was slated for a 100% increase effective July 1, 2014. Price Increase Notices were mailed the same day.

220.     By July 9, 2014, Heritage had increased prices of Glipizide-Metformin nationwide for at least 27 different customers.

221.    On August 20, 2014, an unidentified individual—likely Heritage's Ann Sather—exchanged text messages with a Sun employee. The text exchange described the agreements with Actavis to increase the prices of both Glyburide-Metformin and Verapamil.

222.    Consistent with their agreement on pricing, neither Teva nor Mylan challenged Heritage on its price increases. By November 2014, Teva had increased its bid prices of Glipizide-Metformin to potential customers. Rather than compete in the market, Defendants announced identical list prices and then, as described above, colluded in more detail to inflate bidding and raise the prices paid by their customers. As those higher prices were passed down through the supply chain, because most pharmacies cannot meaningfully adjust their prices, Defendants effectively extracted an illegal profit from pharmacies, as well as from public and private insurers and patients.

223.    The elevated prices of Glipizide-Metformin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

224.    The agreement between at least Heritage, Mylan and Teva regarding Glipizide-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

- **Glyburide**

225.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Glyburide:

226.    Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 diabetes. Introduced in the mid-1980s under the brand names Micronase® and DiaBeta®, generic Glyburide has been available since the mid-1990s.

227.     As of April 2014, Defendants Aurobindo, Heritage, and Teva were the dominant sellers of Glyburide. Defendant Citron began selling Glyburide in July of 2014.

228.     As detailed above, on April 15, 2014, Heritage's Jason Malek called Teva's Nisha Patel and they discussed seven different drugs for which Teva was a competitor of Heritage, including Glyburide. During their conversation, Teva's Patel agreed not to compete on the seven drugs they discussed (including Glyburide). Malek and Patel spoke several more times over the next several months to confirm their and finalize agreements regarding Glyburide and numerous other drugs. At the time of these calls, Teva and Heritage had only one other competitor for glyburide: Aurobindo.

229.     On April 28, 2014, Malek sent an email to Heritage's Dan Lukasiewicz concerning the status of discussions with Aurobindo.

230.     Lukasiewicz eventually spoke to his Aurobindo contact on May 8, 2014.[19] During this call, they agreed to raise the price of a number of drugs, including Glyburide.

231.     In Minnesota the following week, on May 14, 2014, Anne Sather (Heritage) met in person with an Aurobindo employee and agreed to raise the prices of Glyburide. Sather confirmed this agreement in a May 15 email to Malek. Sather also indicated that she would try to meet with Teva at a Minnesota conference.

232.     On June 25, 2014, Anne Sather (Heritage) texted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future. Once it was determined that Citron would be entering the Glyburide market, Citron and Heritage had

---

[19] Lukasiewicz also spoke with his contact at Glenmark for fourteen minutes the same day, and the following day, an Aurobindo employee spoke with an employee of Glenmark, likely about at least Fosi-HCTZ. While coordinating price increases for Glyburide as part of the overarching conspiracy, Aurobindo, Heritage, Glenmark and Sandoz were also coordinating price increases for Fosi-HTCZ.y

extensive phone, text message, and in-person conversations concerning Citron's Glyburide pricing and bidding strategies. Sather confirmed to her friend (Citron) that Teva and Aurobindo had agreed to raise prices.

233.   On July 1, 2014, Citron called an employee at Heritage (presumably Sather) and they spoke for thirteen minutes, confirming Citron's agreement to raise prices on certain drugs, including Glyburide. During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for Glyburide or other drugs. The two spoke for nearly twenty-two minutes the next day.

234.   As Citron entered the Glyburide market in July 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies. Citron set an initial target of obtaining less than 10% of the Glyburide market share. Citron coordinated with Heritage so that it could acquire additional market share without eroding the price increases.

235.   By July 9, 2014, Heritage had successfully increased Glyburide prices for at least seventeen customers. Teva also had increased pricing on Glyburide. Citron, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide prices in line with the price increases on July 15, 2014.

236.   On July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin because of Heritage's price increases. Instead of quoting a price that would win the business, Teva—consistent with Defendants' agreement—raised its own list prices for Glyburide to a similar level as Heritage.

237.   Similarly, in response to Heritage's price increase on Glyburide and other drugs discussed in this complaint, a large wholesaler separately emailed Teva and Aurobindo on July 25,

2014 and asked for bids. Aurobindo and Teva immediately contacted Heritage to coordinate their responses and ensure that they were complying with their pricing agreements.

238.    Teva's Patel and Heritage's Malek spoke for fifteen minutes the day the wholesaler's request was received. After this conversation, Teva declined to provide a bid to the wholesaler.

239.    The same day, Aurobindo and Heritage spoke for thirteen minutes and determined that Aurobindo would not provide a Glyburide bid in response to the wholesaler. Texts between Malek and one of the callers corroborate the content of the conversation. Ultimately, neither Teva nor Aurobindo responded to the bid.

240.    While Teva, Aurobindo, and Heritage were trying to maintain their price increases for Glyburide, Citron was also communicating directly with Aurobindo, presumably to coordinate its entry into the Glyburide market.

241.    On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to speak by phone. They spoke later that day for more than twenty-four minutes. Upon information and belief, the two were communicating about the pricing of Glyburide and other drugs.

242.    The agreement between Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

243.    The elevated prices of Glyburide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

- **Glyburide-Metformin**

244.    Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Glyburide-Metformin:

245.    Glyburide-Metformin, also known by the brand name Glucovance®, is an oral medication used to treat Type 2 diabetes.

246.    Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (entered the market in August 2014), Dr. Reddy's (selling only de minimis amounts by 2011), Heritage (entered the market in January 2013), Par (selling only de minimis amount by 2010), Sandoz (selling only de minimis amounts by 2013), Teva, and Zydus (entered the market in September 2016).

247.    As of April 2014, Teva, Aurobindo, and Actavis were the primary sellers in the market for Glyburide-Metformin. Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

248.    As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of drugs, including Glyburide-Metformin. Patel and Malek agreed not to compete on these drugs, including Glyburide-Metformin. Over the next several months, Malek and Patel spoke several more times to confirm their and finalize agreements.

249.    On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. Malek assigned his sales staff certain Defendants to contact about the proposed price increases. Heritage sales staff Lukasiewicz was assigned to Aurobindo to discuss Glyburide-Metformin and at least one other drug, and Sather was assigned to Actavis to discuss Glyburide-Metformin.

250.     Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs—including with Actavis about Glyburide-Metformin. Sather spoke with Actavis for nine minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price of Glyburide-Metformin and at least one other drug. Sather updated Malek on her communications with Actavis on May 8.

251.     Within Actavis, news of its agreement with Heritage on Glyburide-Metformin and at least one other drug spread quickly. On April 28, 2014, an email to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

252.     In response to that April 28 email, on May 6, an unidentified employee at Actavis called an employee at Mylan, and they spoke for five minutes. They spoke three more times on May 6, with one call lasting fifteen minutes. They continued to communicate over the next several months. It is believed that they discussed at least pricing for Glyburide-Metformin.

253.     On April 28, 2014, Heritage CEO Glazer sent an email to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014. Glazer would request status updates from Lukasiewicz several times at the end of April.

254.     Heritage's Lukasiewicz and his Aurobindo contact spoke for sixteen minutes on May 8, 2014. During this phone call, they reached an agreement to raise the price of Glyburide, Glyburide-Metformin and Fosi-HCTZ.

255.     On May 15, 2014, while attending an industry conference at the Mall of America in Minnesota, Anne Sather confirmed pricing agreements for five different drugs with three

different Defendants. Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

256.    Concurrent with these discussions, on May 12, 2014,  an Actavis employee twice spoke with Aurobindo CEO Bob Cunard, about Glyburide-Metformin pricing. Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

257.    On June 25, 2014, a Heritage employee texted a friend at Citron about Citron's entrance into the Glyburide market. As part of this discussion, they also spoke about Glyburide-Metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

258.    In a July 9, 2014 internal Citron memo, Citron noted that both Heritage and Teva had increased their prices on three different drugs, including Glyburide-Metformin. In the same memo, a Citron employee then reiterated Citron's intent abide by the agreement with Heritage and Teva.

259.    On August 20, 2014, an unidentified individual—likely a Heritage employee— exchanged text messages with a Sun employee. The text exchange described the agreements reached with Actavis to increase the price of Glyburide-Metformin and Verapamil.

260.    By September 2014, Citron had mobilized to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

261.    No shortages or other market features can explain the elevated prices of Glyburide-Metformin.

262.    The elevated prices of Glyburide-Metformin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

263.    The agreement between Actavis, Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

- **Leflunomide**

264.    Plaintiffs allege that as part of the overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Leflunomide:

265.    Leflunomide, also known by the brand name Arava®, is used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

266.    As of April 2014, the main competitors for Leflunomide were Defendants Apotex, Teva, and Heritage. Heritage had a 60% market share.

267.    On April 15, 2014, Malek (Heritage) and Patel (Teva) spoke on the phone and agreed that if Heritage increased prices for Leflunomide, Acetazolamide, Glipizide-Metformin, Glyburide, and Glyburide-Metformin, Teva would support the increase.

268.    Malek and Patel spoke several more times over the next several months to confirm their agreements. During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

269.    While Malek was speaking with Teva's Patel about increasing prices on Leflunomide, among others, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for a number of generic drugs, including at least Leflunomide and the other above-identified generic drugs. Malek personally took responsibility

for communicating with Ascend and Teva. Heritage's Matt Edelson was assigned to Apotex and Dr. Reddy's.

270.    On May 2, 2014, Edelson (Heritage) spoke with Apotex's VP of Sales, Beth Hamilton, for thirteen minutes about at least Leflunomide. Four days later, on May 6, a Heritage employee—likely Edelson—had two more phone calls with Apotex after learning that Teva would be exiting the Leflunomide market.

271.    After speaking with Apotex, Edelson emailed Malek to report what they discussed. Malek replied, confirming the strategy with Edelson.

272.    The following day—on May 7, 2014—Edelson (Heritage) and Hamilton (Apotex) had two more phone conversations where they agreed to avoid competition and increase prices on Leflunomide.

273.    On May 8, in response to an email from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

274.    On May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for Leflunomide.  During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

275.    On May 27, Heritage learned that Apotex increased the price on Leflunomide.

276.    On June 26, 2014, Heritage began sending Price Increase Notices to its customers for nine drugs, including Leflunomide.

277.    Heritage and Apotex continued to increase the effective prices for their Leflunomide tablets over the ensuing months.

278.    No shortages or other market features can explain the Leflunomide price increases. In November 2016, Heritage and Apotex reported shortages. Apotex did not provide a reason. Heritage asserted that there were delays in obtaining the active ingredient. In any case, the large price increases that began in May 2014 cannot be explained by a purported shortage more than two years later.

279.    Teva began exiting the market for Leflunomide around July 2014. Therefore, it did not ultimately raise its prices for this drug. However, Teva did raise prices for other drugs consistent with its agreements with Defendants.

280.    The elevated prices of Leflunomide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

281.    The agreement between Apotex, Heritage and Teva regarding Leflunomide was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

- **Paromomycin**

282.    Plaintiffs allege that as part of the overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Paromomycin:

283.    Paromomycin, also known by the brand names Humatin®, Catenulin® and others, is a broad spectrum oral capsule antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

284.    In April 2014, Sun and Heritage were the competitors in the Paromomycin market. Heritage had approximately 65% market share for Paromomycin.

285.    As discussed above, starting in at least June 2012, Heritage and Sun began discussing price increases and market allocation for at least two drugs— Paromomycin and Nimodipine.

286.    By January 2013, Sun had increased its prices for Paromomycin consistent with Heritage's pricing.

287.    At the April 22, 2014 Heritage price increase teleconference, Malek assigned Anne Sather to communicate with Sun.

288.    Right after the Heritage sales call, Sather communicated with three different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

289.    Anne Sather (Heritage) spoke with Susan Knoblauch (Sun) for more than forty-five minutes. During this conversation, Sather and Knoblauch discussed pricing and agreed to increase the prices of numerous drugs, including Paromomycin. Sather immediately reported her agreement with Sun to Malek.

290.    In response to a May 8 status request from Malek, Sather emailed him to report the agreement she had reached with a number of competitors, including with Sun for Paromomycin.[20]

291.    Heritage and Sun spoke again for more than twelve minutes on May 20. During the call, Heritage learned that Sun would be making changes to the production of Paromomycin.

292.    By July 9, 2014, Heritage had successfully increased the price of Paromomycin to at least thirteen different customers nationwide.

---

[20] Sather also reported agreements she reached with Actavis for Glyburide-Metformin and Verapamil, Lannett for Doxy Mono and Sun for Nystatin.

293.     The agreement between Heritage and Sun regarding Paromomycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue. The elevated prices of Paromomycin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

- **Theophylline**

294.     Plaintiffs allege that as part of their overarching conspiracy in the generic drug market, Defendants did as follows in furtherance of that conspiracy as it relates to Theophylline:

295.     Theophylline ER, also known by the brand name Theodur®, is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema.

296.     Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva, via its subsidiary Pliva, had captured nearly 100% of sales.

297.     Upon entry, Heritage's Theophylline list prices were identical to or higher than Teva's. Consistent with their "fair share" agreement, prices did not decline.

298.     On February 4, 2014, Teva's Patel contacted Heritage's Malek. Malek returned her call the next day and the two spoke for more than an hour and discussed a price increase for Theophylline and at least one other drug (Nystatin).

299.     Throughout February and March 2014, Malek and Patel had a series of phone calls discussing price increases for multiple drugs, including Theophylline.

300.     Shortly thereafter, Teva began implementing list and effective price increases for Theophylline. These price increases also had an effective date of April 4, 2014.

301.     By the time Heritage held its April 22, 2014 meeting with its sales team to discuss a number of price increases, it had already agreed with Teva to raise the price of Theophylline and

another drug and to follow Teva's lead on pricing. As he outlined the proposed price increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on Theophylline.

302.    On April 24, 2014, Teva received an email from a customer hoping for relief from the price increases. Consistent with its agreement with Heritage, Teva held to its price increase for Theophylline.

303.    On June 25, Malek had a nearly fourteen-minute call with a Teva employee—likely Patel. Malek reported that Heritage would be sending out price increase notices on June 26 for Theophylline and several other drugs for which Heritage and Teva had agreed to raise prices.

304.    Heritage began telling its customers that it would be increasing its prices for nine different drugs,[21] including Theophylline, on June 26, 2014. By July 9, 2014, among the other price increases it implemented, Heritage increased its Theophylline prices to at least twenty different customers nationwide

305.    The elevated prices of Theophylline that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market.

306.    The agreement between Heritage and Teva regarding Theophylline was part of all Defendants' overarching conspiracy to unreasonably restrain trade within the generic pharmaceutical industry and to fix, raise or stabilize the prices of the Drugs at Issue.

---

[21] Heritage issued prices increase letters for (1) Acetazolamide ER; (2) Fosi-HCTZ; (3) Glipizide-metformin; (4) Glyburide; (5) Leflunomide; (6) Nimodipine; (7) Nystatin; (8) Paromomycin; and (9) Theophylline.

- **Verapamil**

307.    Plaintiffs allege that in furtherance of Defendants' overarching "fair share" conspiracy in the generic drug market, Defendants Actavis, Heritage and Mylan did as follows in furtherance of that conspiracy as it relates to Verapamil:

308.    Verapamil is a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders. It works by relaxing the muscles of the heart and blood vessels.

309.    The relevant manufacturers of Verapamil are Actavis, Heritage and Mylan.

310.    From 2009 forward, Actavis and Mylan were the major manufacturers of Verapamil HCl regular release tablets and of certain dosages of Verapamil HCl sustained release capsules. Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. In 2011, it announced 80mg tablet list prices identical to Mylan and slightly higher than Actavis, and 120mg tablets list prices slightly higher than both Mylan and Actavis. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

311.    Instead of entering the market with lower prices for Verapamil tablets, Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan. This was entirely consistent with Defendants' "fair share" agreement.

312.    By raising the prices, which triggered counterbids, Defendants orchestrated for themselves opportunities to allocate fair share at artificially high prices. For example, in October 2012, Mylan increased its tablet prices by approximately 50%, which allowed Heritage to gain share, and by January, Heritage had 25% of the tablet market. As per their "fair share" sub-arrangement, market shares between Actavis, Heritage and Mylan quickly stabilized and remained relatively constant thereafter.

313.    As part of those price increase discussions following the aforementioned April 22, 2014 Heritage sales teleconference, Heritage's O'Mara had the primary responsibility for communicating with Mylan about Verapamil and several other drugs. On April 23, O'Mara contacted his counterpart at Mylan (likely Michael Aigner). O'Mara and Aigner agreed to raise prices on at least three different drugs, including Verapamil.

314.    Immediately afterwards, O'Mara emailed Malek an update of his discussions with Mylan.

315.    Heritage's Anne Sather was responsible for speaking with Actavis about Verapamil, among other drugs. On April 22, she and an unidentified Actavis employee spoke for nine minutes and reached an agreement to raise the price of Verapamil and other drugs slated for an increase.

316.    News of the agreement on Verapamil and at least one other drug reached the Actavis sales and pricing team in April 28, 2014, including through an internal email discussing potential price increases for a list of different drugs.

317.    On May 6, 2014, an unidentified Actavis employee called a Mylan employee and left a message seeking to discuss at least pricing for Verapamil. The two spoke again on May 9 and May 19, and continued to communicate over the next several months.

318.    On May 8, 2014, Malek emailed the Heritage sales team requesting an update on competitior communications. A Heritage employee responded to Malek's email, providing an update on communications with at least Actavis (Verapamil and Glyburide-Metformin), Lannett (Doxy Mono), and Sun (Nystatin and Paromomycin).

319.    While Heritage did not increase its Verapamil prices market-wide in July as it did for other drugs, it increased the price of Verapamil to at least one customer as the result of Defendants' price increase efforts.

320.    On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun. The text exchange described the agreement Heritage and Actavis reached to increase the price of Verapamil among other drugs.

321.    Actavis and Mylan similarly communicated to coordinate increases on their Verapamil HCl sustained releases capsules (120mg, 180mg, 240mg).

322.    From April of 2012 (shortly before Mylan hiked prices for Verapamil tablets) through April of 2016, Mylan's Verapamil capsule prices nearly tripled, and Actavis's prices doubled. By the spring of 2016, Actavis and Mylan had nearly identical list prices.

323.    The higher prices for 120mg, 180mg and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market. Between April 2012 and May 2016, Actavis's prices for 360mg capsules nearly tripled.

324.    No shortages or other market features can explain Defendants' price increases for Verapamil.

## VI.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy.

325.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until, at the earliest, October 31, 2017. Prior to that time, no information available to Plaintiffs was sufficient to suggest an overarching conspiracy or specific arrangements regarding the Drugs At Issue (with the exception of Doxycycline Hyclate and Glyburide).

326.     Plaintiffs indirectly purchased generic drugs manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

327.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

328.     For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled, with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.     Fraudulent Concealment Tolled the Statutes of Limitations.**

329.     In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

330.     Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

### 1.   Active Concealment of the Conspiracy.

331.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

332.    Through their lying, deceptive, and false statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

333.    For example, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

334.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

335.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

336.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

### 2.    Plaintiffs Exercised Reasonable Diligence.

337.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

338.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the details of the conspiracy alleged herein at an earlier date by the exercise of reasonable diligence.

339.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

340.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XIII.   CONTINUING VIOLATIONS

341.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XIV.   DEFENDANTS' ANTITRUST VIOLATIONS

342.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for the Drugs at Issue sold in the United States.

343.    In formulating and effectuating the contract, combination or conspiracy, Defendants:

        (a)     participated in meetings and/or conversations regarding the price of the Drugs at Issue in the United States;

        (b)     agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of the Drugs at Issue sold in the United States;

        (c)     agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of the Drugs at Issue; and

        (d)     issued price announcements and price quotations in accordance with their agreements.

344.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

345.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

346.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for the Drugs at Issue than they would have paid in a competitive market. Wholesalers who purchased directly from Defendants were able to pass on overcharges to Plaintiff pharmacies, who have no meaningful ability to set their own resale / retail prices due to the automated and contract-bound nature of the modern pharmaceutical supply chain. The impairment of generic competition at the direct purchaser level caused similar injuries to all privately-owned pharmacies, who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

347.     The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)     price competition in the markets for the Drugs at Issue have been artificially restrained;

(b)     prices for the Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     pharmacy purchasers of the Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

## XV.    CLASS ACTION ALLEGATIONS

348.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule

23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on

behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Drugs at Issue from March 1, 2011 through the present.

> This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Drug at Issue directly from Defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

> The Drugs at Issue currently include:  Acetazolamide tablets (125mg and 250mg) and extended release capsules (500mg); Doxycycline Hyclate regular release ("Doxy RR") tablets (100mg) and capsules (50mg and 100mg); Doxycycline Hyclate delayed release ("Doxy DR") tablets (75mg, 100mg and 150mg); Doxycycline Monohydrate tablets (50mg, 75mg, 100mg and 150mg); Fosinopril-Hydrochlorothiazide tablets (10-12.5mg and 20-12.5mg); Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg); Glyburide tablets (1.25mg, 2.5mg and 5mg); Glyburide-Metformin Hydrochloride tablets (1.25-250mg, 2.5-500mg, and 5-500mg); Leflunomide tablets (10mg and 20mg); Meprobamate tablets (200mg and 400mg); Nimodipline capsules (30mg/l); Nystatin cream; Nystatin ointment; and Nystatin oral tablets; Paromomycin Sulphate capsules (250mg); Theophylline (anhydrous) extended release tablets (100mg, 200mg, 300mg, 450mg, and 600mg); Verapamil Hydrochloride regular tablets (40mg, 80mg, and 120mg) and Verapamil Hydrochloride extended release capsules (120mg, 180mg, 240mg, and 360mg), and Verapamil Hydrochloride delayed release capsules (120mg, 180mg, and 240mg); Zoledronic Acid for intravenous infusion (4mg/5ml and 5mg/100mL).

349.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[22] on

behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Drugs at Issue from March 1, 2011 through the present.

> This class excludes:   (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Drug at Issue directly from Defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

> The Drugs at Issue currently include:   Acetazolamide tablets (125mg and 250mg) and extended release capsules (500mg); Doxycycline Hyclate regular release ("Doxy RR") tablets (100mg) and capsules (50mg and 100mg); Doxycycline Hyclate delayed release ("Doxy DR") tablets (75mg, 100mg and 150mg); Doxycycline Monohydrate tablets (50mg, 75mg, 100mg and 150mg); Fosinopril-Hydrochlorothiazide tablets (10-12.5mg and 20-12.5mg); Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg); Glyburide tablets (1.25mg, 2.5mg and 5mg); Glyburide-Metformin Hydrochloride tablets (1.25-250mg, 2.5-500mg, and 5-500mg); Leflunomide tablets (10mg and 20mg); Meprobamate tablets (200mg and 400mg); Nimodipline capsules (30mg/l); Nystatin cream; Nystatin ointment; and Nystatin oral tablets; Paromomycin Sulphate capsules (250mg); Theophylline (anhydrous) extended release tablets (100mg, 200mg, 300mg, 450mg, and 600mg); Verapamil Hydrochloride regular tablets (40mg, 80mg, and 120mg) and Verapamil Hydrochloride extended release capsules (120mg, 180mg, 240mg, and 360mg), and Verapamil Hydrochloride delayed release capsules (120mg, 180mg, and 240mg); Zoledronic Acid for intravenous infusion (4mg/5ml and 5mg/100mL).

---

[22] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

350.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

351.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

352.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;

(b)    The identity of the participants of the conspiracy;

(c)    The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling

Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

353.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Drugs at Issue purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

354.     Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

355.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

356.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

357.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XVI.   **CAUSES OF ACTION**

358.     As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in Counts 1 through 4 below.

**FIRST COUNT**
**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

359.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

360.    This count is also brought against Defendant-participants in each of the drug-specific sub-agreements in furtherance of the conspiracy alleged above, which include:[23]

| | | |
|---|---|---|
| Acetazolamide | Capsules | Heritage, Teva, Zydus |
| | Tablets | Lannett, Taro |
| Doxycycline Monohydrate | | Heritage, Lannett, Mylan, Par |
| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

---

[23] The Doxycycline Hyclate (DR and RR) sub-agreements were part of the overarching conspiracy, but are not included in this Count as a sub-agreement because Plaintiffs seek relief via their existing complaint, (16-DX-27243-CMR, Dkt. 39) which has already been briefed on a motion to dismiss.

361.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

362.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Drugs at Issue, thereby creating anticompetitive effects.

363.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

364.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Drugs at Issue.

365.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Drugs at Issue have been harmed by being forced to pay inflated, supracompetitive prices for generic Drugs at Issue.

366.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

367.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for the Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for the Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased the Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

368.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for the Drugs at Issue purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

369.    Plaintiffs must continue purchasing the Drugs at Issue in order to continue to operate their businesses.

370.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

371.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

**SECOND COUNT**
**Violation of State Antitrust Statutes[24]**
**(on behalf of Plaintiffs and the Damages Class)**

372.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

373.    This count is also brought against Defendant-participants in each of the drug-specific sub-agreements alleged above, which include the following:[25]

| | | |
|---|---|---|
| Acetazolamide | Capsules | Heritage, Teva, Zydus |
| | Tablets | Lannett, Taro |
| Doxycycline Monohydrate | | Heritage, Lannett, Mylan, Par |
| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

---

[24] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

[25] The Doxycycline Hyclate (DR and RR) sub-agreements were part of the overarching conspiracy, but are not included in this Count as a sub-agreement because Plaintiffs seek relief via their existing complaint, (16-DX-27243-CMR, Dkt. 39).

374.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of the Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

375.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of the Drugs at Issue and to allocate customers for the Drugs at Issue in the United States.

376.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price the Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to the Drugs at Issue provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

377.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for the Drugs at Issue. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

378.   In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

379.   Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, injunctive relief, including restitution and/or disgorgement, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

380.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

381.   **Arizona**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout Arizona; (2) prices of the Drugs at Issue were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

382.    **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of the Drugs at Issue at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of the Drugs at Issue. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of the Drugs at Issue. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for the Drugs at Issue has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for the Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased the Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for the Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and

members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

383.    **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants sold the Drugs at Issue in the District of Columbia during the Class Period. Defendants' combination and conspiracy had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices of the Drugs at Issue were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased the Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased the Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Drugs at Issue, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

384.    **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants sold the Drugs at Issue in Illinois, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce; (3) Plaintiffs and members of the Damages Class, who resided in Illinois and/or purchased the Drugs at Issue in Illinois were deprived of free and open competition in Illinois; and (4) Plaintiffs and members of the Damages Class, who resided in Illinois and/or purchased the Drugs at Issue in Illinois paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Illinois. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

385.    **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

386.   **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Drugs at Issue, increasing the prices of generic Drugs at Issue, preventing competition in the sale of generic Drugs at Issue, or binding themselves not to sell generic Drugs at Issue, in a manner that established the price of generic Drugs at Issue and precluded free and unrestricted competition among themselves in the sale of generic Drugs at Issue, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants sold the Drugs at Issue in Kansas, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class, who resided in Kansas and/or purchased the Drugs at Issue in Kansas were deprived of free and open competition in Kansas; and (4) Plaintiffs and members of the Damages Class, who resided in Kansas and/or purchased the Drugs at Issue in Kansas paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

387.   **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants sold the Drugs at Issue in Mainein new mex during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained,

suppressed, and eliminated throughout Maine; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class, who resided in Maine and/or purchased the Drugs at Issue in Maine were deprived of free and open competition in Maine; and (4) Plaintiffs and members of the Damages Class, who resided in Maine and/or purchased the Drugs at Issue in Maine paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

388.    **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

389.    **Minnesota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants sold the Drugs

at Issue, in Minnesota, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class, who resided in Minnesota and/or purchased the Drugs at Issue in Minnesota were deprived of free and open competition in Minnesota; and (4) Plaintiffs and members of the Damages Class, who resided in Minnesota and/or purchased the Drugs at Issue in Minnesota paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

390.    **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants sold the Drugs at Issue in Mississippi, during the Class Period. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Drugs at Issue prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, who resided in Mississippi and/or purchased the Drugs at Issue in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the Damages Class, who resided in Mississippi and/or purchased the Drugs at Issue in Mississippi paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

391.     **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants sold the Drugs at Issue in Nebraska, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class, who resided in Nebraska and/or purchased the Drugs at Issue in Nebraska were deprived of free and open competition in Nebraska; and (4) Plaintiffs and members of the Damages Class, who resided in Nebraska and/or purchased the Drugs at Issue in Nebraska paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class

have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

392.  **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants sold the Drugs at Issue, in Nevada, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, who resided in Nevada and/or purchased the Drugs at Issue in Nevada were deprived of free and open competition in Nevada; and (4) Plaintiffs and members of the Damages Class, who resided in Nevada and/or purchased the Drugs at Issue in Nevada paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

393.  **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was

- 88 -

restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

394.    **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants sold the Drugs at Issue in New Mexico during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class, who resided in New Mexico and/or purchased the Drugs at Issue in New Mexico were deprived of free and open competition in New Mexico; and (4) Plaintiffs and members of the Damages Class, who resided in New Mexico and/or purchased the Drugs at Issue in New Mexico paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in

restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

395.    **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, *et seq*. Defendants sold the Drugs at Issue in New York during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce; (3) Plaintiffs and members of the Damages Class, who resided in New York and/or purchased the Drugs at Issue in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class, who resided in New York and/or purchased the Drugs at Issue in New York paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New York. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

396.    **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants sold the

Drugs at Issue in North Carolina during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, who resided in North Carolina and/or purchased the Drugs at Issue in North Carolina, were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class, who resided in North Carolina and/or purchased the Drugs at Issue in North Carolina paid supracompetitive, artificially inflated prices for the Drugs at Issue, in North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et seq*.

397.   **North Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants sold the Drugs at Issue in North Dakota during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class, who resided in North Dakota and/or purchased the Drugs at Issue in North Dakota were deprived of free and open competition in North Dakota; and (4) Plaintiffs

and members of the Damages Class, who resided in North Dakota and/or purchased the Drugs at Issue in North Dakota paid supracompetitive, artificially inflated prices for the Drugs at Issue, in North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

398.   **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants sold the Drugs at Issue in Oregon, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class, who resided in Oregon and/or purchased the Drugs at Issue in Oregon were deprived of free and open competition in Oregon; and (4) Plaintiffs and members of the Damages Class, who resided in Oregon and/or purchased the Drugs at Issue in Oregon paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705,

*et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

399.   **Rhode Island**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

400.   **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants sold the Drugs at Issue in South Dakota during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, who resided in South Dakota and/or purchased the Drugs at Issue in South Dakota were deprived of free and open competition in South Dakota; and (4) Plaintiffs and members of the Damages Class, who resided in South Dakota and/or purchased the Drugs at

Issue in South Dakota paid supracompetitive, artificially inflated prices for the Drugs at Issue, in South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

401.     **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants sold the Drugs at Issue in Tennessee during the Class Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, who resided in Tennessee and/or purchased the Drugs at Issue in Tennessee were deprived of free and open competition in Tennessee; and (4) Plaintiffs and members of the Damages Class, who resided in Tennessee and/or purchased the Drugs at Issue in Tennessee paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation

of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages

Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

402.   **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade

in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had

the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and

eliminated throughout Vermont; (2) generic Drugs at Issue prices were raised, fixed, maintained

and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants'

illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in

their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann.

9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief

available under Vermont Stat. Ann. 9 § 2453, *et seq*.

403.   **West Virginia**: Defendants have entered into an unlawful agreement in restraint of

trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts

described above were knowing, willful, and constitute violations or flagrant violations of West

Virginia Antitrust Act. Defendants sold the Drugs at Issue in West Virginia during the Class

Period. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at

Issue price competition was restrained, suppressed, and eliminated throughout West Virginia; (2)

generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels

throughout West Virginia; (3) Plaintiffs and members of the Damages Class, who resided in West

Virginia and/or purchased the Drugs at Issue in West Virginia were deprived of free and open

competition in West Virginia; and (4) Plaintiffs and members of the Damages Class, who resided

in West Virginia and/or purchased the Drugs at Issue in West Virginia paid supracompetitive, artificially inflated prices for the Drugs at Issue, in West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

404.    **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants sold the Drugs at Issue in Wisconsin during the Class Period. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class, who resided in Wisconsin and/or purchased the Drugs at Issue in Wisconsin were deprived of free and open competition in Wisconsin; and (4) Plaintiffs and members of the Damages Class, who resided in Wisconsin and/or purchased the Drugs at Issue in Wisconsin paid supracompetitive, artificially inflated prices for the Drugs at Issue, Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are

threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

405.    **As to All Jurisdictions Above**: Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

406.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

407.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD COUNT**
**Violation of State Consumer Protection Statutes [26]**
**(on behalf of Plaintiffs and the Damages Class)**

409.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

410.    This count is also brought against Defendant-participants in each of the drug-specific sub-agreements alleged above, which include the following:[27]

| | | |
|---|---|---|
| Acetazolamide | Capsules | Heritage, Teva, Zydus |
| | Tablets | Lannett, Taro |
| Doxycycline Monohydrate | | Heritage, Lannett, Mylan, Par |
| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

---

[26] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, West Virginia and Wisconsin.

[27] The Doxycycline Hyclate (DR and RR) sub-agreements were part of the overarching conspiracy, but are not included in this Count as a sub-agreement because Plaintiffs seek relief via their existing complaint, (16-DX-27243-CMR, Dkt. 39).

411.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

412.     **Alaska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and generic drug purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

413.     **Arkansas**: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Arkansas and took efforts to

conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants also increased the prices of medical supplies by 10% or more during the 30 days following a declaration of a state of emergency by the Governor, which constitutes an unfair or deceptive act or practice in violation of A.C.A. § 4-88-303 *et seq*. Arkansas declared a state of emergency on at least January 3, 2014, April 24, 2015, and February 18, 2015.  Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and generic drug purchasers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

414.  **California**: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Drugs at Issue in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these

Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Drugs at Issue in the State of California within the meaning of § 17200, California Business and Professions Code; (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code and (5) Defendants unlawfully raised the price of "medical supplies" by more than 10% during the 30 days following a declaration by the Governor of California of a state of emergency[28] in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues,

---

[28] August 22, 2012; July 12, 2013; July 19, 2013; August 22, 2013; August 23, 2013; August 29, 2013; September 20, 2013; September 30, 2013; October 31, 2013; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015.

earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and generic drug purchasers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Drugs at Issue. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

415. **Colorado**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential purchasers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Drugs at Issue prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and purchasers of generic drugs. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

416.   **Delaware**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*. Defendants sold the Drugs at Issue, in Delaware, during the Class Period and deceived Plaintiffs and/or class members in Delaware into believing that the Drugs at Issue were competitively priced. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class, who resided in Delaware and/or purchased the Drugs at Issue in Delaware were deprived of free and open competition in Delaware; and (4) Plaintiffs and members of the Damages Class, who resided in Delaware and/or purchased the Drugs at Issue in Delaware paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Delaware. During the

Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

417.    **Florida**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants sold the Drugs at Issue in Florida, during the Class Period and deceived Plaintiffs and/or class members in Florida into believing that the Drugs at Issue were competitively priced. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class, who resided in Florida and/or purchased the Drugs at Issue in Florida, were deprived of free and open competition in Florida; and (4) Plaintiffs and members of the Damages Class, who resided in Florida and/or purchased the Drugs at Issue in Florida paid supracompetitive, artificially inflated prices for the Drugs at Issue, in Florida. During the Class Period, Defendants' illegal conduct substantially

affected Florida commerce and purchasers of generic drugs. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

418.    **Georgia**:   Defendants   have   engaged   in   unfair   competition   or   unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs

at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

419.   **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and generic drug purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

420.   **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and generic drug purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

421.  **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold the Drugs at Issue in New Hampshire and deceived Plaintiffs and Class Members in New Hampshire into believing that the Drugs at Issue were competitively priced. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class, who resided in New Hampshire and/or purchased the Drugs at Issue in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiffs and members of the Damages Class, who resided in New Hampshire and/or purchased the Drugs at Issue in New Hampshire paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and generic drug purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev.

Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

422.   **New Jersey**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants raised prices of generic drugs, which are "merchandise used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% in the 30 days following a declaration of emergency by the Governor of New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq*. The Governor declared a state of emergency on at least October 27, 2012, February 11, 2013, December 23, 2013, January 2, 2014, and January 26, 2015. Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and generic drug purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth

above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

423. **New Mexico**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Drugs at Issue were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Drugs at Issue as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set list and effective prices price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs

and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Drugs at Issue, including their illegal conspiracy to secretly fix the price of the Drugs at Issue at supracompetitive levels and overcharge generic drug purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices such that there was a gross disparity between the price paid and the value received for the Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout New Mexico; (2) prices of the Drugs at Issue were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and generic drug purchasers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

424.   **New York**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which the Drugs at Issue were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants sold the Drugs at Issue

in New York and deceived Plaintiffs and Class Members, in New York into believing the Drugs at Issue were competitively priced. Defendants and their co-conspirators made public statements about the prices of the Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for the Drugs at Issue; and Defendants alone possessed material information that was relevant to purchasers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased the Drugs at Issue were misled to believe that they were paying a fair price for the Drugs at Issue or the price increases for the Drugs at Issue were for valid business reasons. Defendants knew that their unlawful trade practices with respect to pricing the Drugs at Issue would have an impact on New York purchasers, including pharmacies—not just Defendants' direct customers. Defendants also knew that the Drugs at Issue would ultimately be purchased by pharmacies such as Plaintiffs. Defendants knew that their unlawful trade practices with respect to pricing the Drugs at Issue would have a broad impact, causing those who indirectly purchased the Drugs at Issue to be injured by paying more for the Drugs at Issue than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout New York; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York (3) Plaintiffs and members of the

Damages Class, who resided in New York and/or purchased the Drugs at Issue in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class, who resided in New York and/or purchased the Drugs at Issue in New York paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New York. During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in New York, and Defendants' illegal conduct substantially affected New York commerce and generic drug purchasers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Drugs at Issue in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

425.    **North Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants sold the Drugs at Issue in North Carolina and deceived Plaintiffs and Class Members in North Carolina into believing that the Drugs at Issue were competitively priced. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false

justifications regarding their price increases. Defendants' public statements concerning the price of generic Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina drug purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants charged "unreasonably excessive" prices for health-related goods in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38, and § 75-1.1.  The Governor declared a state of emergency on at least April 28, 2014, January 26, 2015, February 16, 2015, October 1, 2015, and January 20, 2016.  Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, who resided in North Carolina and/or purchased the Drugs at Issue in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class, who resided in North Carolina and/or purchased the Drugs at Issue in North Carolina paid supracompetitive, artificially inflated prices for the Drugs at Issue, in North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and generic drug purchasers. During the Class Period, each of Defendants named

herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Drugs at Issue in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

426.   **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and generic drug purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use

or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

427. **Rhode Island**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. Defendants'

illegal conduct substantially affected Rhode Island commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

428.    **South Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

429. **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased generic drugs in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants'

affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

430.    **West Virginia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

431.    **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Drugs at Issue was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of generic drugs. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,

as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Drugs at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH COUNT
#### Unjust Enrichment[29]
#### (on behalf of Plaintiffs and the Damages Class)

432.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

433.    Defendants have unlawfully benefited from their sales of generic Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions. Pharmacies are intended purchasers of the Drugs at Issue.

---

[29] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

434.     Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

435.     Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

436.     Defendants have been enriched by revenue resulting from unlawful overcharges for generic Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for generic Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

437.     There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

438.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Drugs at Issue.

439.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Drugs at Issue are ascertainable by review of sales records.

440.      It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other

person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Drugs at Issue.

441. It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Drugs at Issue, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

442. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

443. The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

444. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

445. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Drugs at Issue prices remain inflated above pre-conspiracy levels.

446.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Drugs at Issue.

447.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Drugs at Issue by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## VII.    REQUEST FOR RELIEF

Plaintiffs request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The unlawful conduct alleged herein be decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants and their employees be permanently enjoined from continuing, maintaining or renewing the conduct alleged herein, or from entering into any other conspiracy having a similar purpose or effect.

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: June 18, 2018

*/s/  Peter Gil-Montllor*

Peter Gil-Montllor
Christian Hudson
**CUNEO, GILBERT & LADUCA LLP**
16 Court Street, Suite 1012
Brooklyn, NY 11241
202-789-3960
pgil-montllor@cuneolaw.com

Respectfully submitted,

*/s/  Jonathan W. Cuneo*

Jonathan W. Cuneo
Joel Davidow
Victoria Romanenko
**CUNEO, GILBERT & LADUCA LLP**
4725 Wisconsin Ave., NW Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com
*Lead Counsel for the Indirect Reseller Plaintiffs*